**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, Derivatively on Behalf of Nominal Defendant UNITEDHEALTH GROUP INCORPORATED,<br><br>Plaintiff,<br>v.<br><br>STEPHEN J. HEMSLEY, ANDREW P. WITTY, JOHN F. REX, TIMOTHY J. NOEL, THE ESTATE OF BRIAN R. THOMPSON, RICHARD T. BURKE, CHARLES D. BAKER, TIMOTHY P. FLYNN, PAUL R. GARCIA, KRISTEN L. GIL, SCOTT GOTTLIEB, MICHELE J. HOOPER, F. WILLIAM McNABB III, VALERIE MONTGOMERY RICE, and JOHN H. NOSEWORTHY,<br><br>Defendants,<br><br>and<br><br>UNITEDHEALTH GROUP INCORPORATED,<br><br>Nominal Defendant. | Case No. ___-cv-_____<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Vladimir Gusinsky Revocable Trust ("**Plaintiff**" or the "**Trust**"), by and through its undersigned attorneys, brings this verified stockholder derivative complaint on behalf of and for the benefit of nominal defendant UnitedHealth Group Incorporated ("**UnitedHealth**" or the "**Company**") against certain of its current and former directors and officers (the "**Individual Defendants**," defined below), to remedy their breaches of fiduciary duty, insider trading, waste of corporate assets, unjust enrichment, and violations of the federal securities laws for the period from at least January 1, 2016 through the present (the "**Relevant Period**").

Plaintiff's allegations are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*: (*i*) the investigation of its counsel; (*ii*) the allegations in the operative complaint in the pending securities class action, *Cal. Pub. Emps.' Ret. Sys. v. UnitedHealth Grp. Inc.*, No. 0:24-cv-01743 (JMB/JFD) (D. Minn. Aug. 27, 2025) (the "**Securities Class Action**"), ECF No. 157 (the "**Securities Compl.**"); (*iii*) the allegations in the complaint-in-partial-intervention of the United States in *United States ex rel. Poehling v. UnitedHealth Grp. Inc.*, No. 2:16-cv-08697 (C.D. Cal. May 16, 2017) (the *Qui Tam* Action), ECF No. 114 (the "***Qui Tam* Compl.**"); (*iv*) the contents of the majority staff report of the Senate Judiciary Committee, January 12, 2026, *How UnitedHealth Group Puts the Risk in Medicare Advantage Risk Adjustment* (Jan. 12, 2026) (the "**Grassley Report**"),[1] together with over 50,000 pages of Bates-stamped internal Company documents released therewith; (*v*) the allegations in the allegations in the Verified Stockholder Derivative Complaint in the stockholder derivative action, *Collins v. Witty*, No. 0:24-cv-03484 (D. Minn., Aug. 29, 2024), ECF No. 1 (the "***Collins* Compl**."); (*vi*) the Company's public filings with the United States Securities and Exchange Commission ("SEC"); (*vii*) the allegations in the complaint of the Massachusetts Attorney General in *Commonwealth v. UnitedHealthcare Ins. Co.*, No. 2684CV01570 (Mass. Super. Ct. Suffolk Cnty. filed May 29, 2026) (the "**Mass. AG Action**"); (*viii*) press releases, analyst reports, media reports, and other publicly-available information concerning the Company; and (*ix*) Plaintiff's litigation demand and the response of the Company's Board of Directors (the "**Board**") thereto. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[1] https://www.grassley.senate.gov/imo/media/doc/uhg_report_-_final.pdf

## NATURE AND SUMMARY OF THE ACTION

1. UnitedHealth is a vertically integrated insurer, healthcare provider, pharmacy benefit manager, and healthcare software and services vendor, and the largest health insurance company in the United States. It operates two complementary businesses: UnitedHealthcare, Inc. (together with its subsidiaries, "**UnitedHealthcare**," *see* ¶ 57), the Company's insurance arm, and Optum, Inc. (together with its subsidiaries, "**Optum**," *see* ¶ 58), the Company's information- and technology-enabled health services business.

2. In 2010, President Obama signed the Affordable Care Act ("**ACA**"), which requires, among other things, '"insurers to spend a greater percentage of premiums collected on actual healthcare expenses rather than administrative costs or profits. The ratio of healthcare expenses to administrative costs and profits is called the "medical loss ratio" ("**MLR**").

3. UnitedHealth responded to the enactment of the ACA by launching Optum in April 2011 and spending more than $60 billion on vertical expansion, a structure that permitted UnitedHealthcare to collect premiums, direct patients to Optum providers, and pay itself (UnitedHealth, the parent) for the care required to satisfy the MLR floor, thereby retaining profits on both sides of the ledger. That structure placed regulatory compliance at the core of the Company's business model and made oversight of Medicare billing and antitrust compliance a mission-critical function of the Board. *See Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019).

4. Medicare is a federal health insurance program for people age 65 and older. There are two types of Medicare. Original Medicare is managed by the federal government and includes Part A (hospital) and Part B (medical). It does not include perks like vision and dental coverage, and recipients must buy their own prescription (Part D) coverage. Medicare Advantage (Part C) is

an all-in-one alternative to Original Medicare provided by private insurers and bundle Part A, Part B, usually Part D, and often additional perks like vision and dental coverage.

5. As alleged in the Securities Complaint, management formulated and oversaw a Company-wide scheme to "*upcode*" Medicare Advantage members—that is, to diagnose members with conditions that made them appear sicker and caused Medicare to overpay the Company.

6. The mechanisms used to perpetuate this scheme included bonuses to providers who upcoded, training on "buddy codes," the HouseCalls in-home assessment program, software programmed to recommend lucrative diagnoses, and unreliable medical devices prone to false positives. According to an analysis of Medicare data by *The Wall Street Journal*, in 2021 alone UnitedHealth collected $8.7 billion in taxpayer funds for diagnosis codes that no doctor treated.

7. The federal government's allegations are neither new, speculative, nor generic. In February 2017, the United States Department of Justice ("**DOJ**") intervened in the *Qui Tam* Action filed by relator Benjamin Poehling, a former finance director of the Company's Medicare business, alleging that the Company's national Chart Review Program operated as a one-way revenue engine that mined millions of patient charts each year to capture additional diagnosis codes worth billions of dollars in incremental risk-adjustment payments while ignoring, in bad faith, what those same reviews revealed: that many codes the Company had already submitted to the Centers for Medicare & Medicaid Services ("CMS") lacked support in the medical records. (*Qui Tam* Complaint ¶¶ 8–10, 21) The DOJ's allegations reach the Company's Chairman and CEO, Defendant Stephen Hemsley personally, as detailed herein.

8. The Office of Inspector General of the Department of Health and Human Services ("**OIG**") placed the Company on notice years ago. A September 2021 OIG report found that UnitedHealth disproportionately leveraged chart reviews and health risk assessments to drive risk-

adjusted payments, and a follow-on October 2024 OIG report—finding that UnitedHealth "stood out from its peers" in using those tools—found that the practice continued through 2023.

9. On January 12, 2025, the Senate Judiciary Committee released the Grassley Report, which concludes that the Company "turned risk adjustment into a major profit centered strategy" contrary to the program's original intent and catalogues, in the Company's own training materials, software documentation, policies, and audit tools, an institutionalized diagnosis-capture apparatus embedded in enterprise-wide policy. (Grassley Report at 2, 24–56). The Grassley Report quantifies the Company's outlier status: differential coding worth an estimated $1,863 per member versus an industry average of $1,220; nearly two-thirds of all industry payments for diagnoses reported only on in-home assessments and linked chart reviews; and approximately $2,735 earned per in-home assessment, versus $1,525 for Humana and $232 for CVS/Aetna. (*Id.* at 21–22 & nn.104–09.)

10. On October 10, 2023, the Company received notice that DOJ had launched a nonpublic antitrust investigation into the Company. (*Collins* Complaint ¶ 9). The Company neither disclosed the investigation to investors nor restricted insider sales. The investing public did not learn of the investigation until *The Wall Street Journal*—not the Company—disclosed it on February 27, 2024, upon which the Company's stock price declined by $27 per share, erasing nearly $25 billion in stockholder value.

11. In the four months between the Company' learning of the DOJ investigation and the investigation becoming public, Company insiders sold more than $117 million of their personally held UnitedHealth shares, including more than $101 million by Defendant Hemsley and $15.1 million by UnitedHealthcare's then-CEO, Brian Thompson. The Forms 4 relating to these sales indicate that none of them were made pursuant Rule 10b5-1 trading plans.

12. While insiders sold, the Company bought. From January 2024 through March 2025, the Board caused or permitted the Company to deploy over $12 billion to repurchase its own stock at average prices ranging from approximately $484 to $593 per share—prices artificially inflated by the concealed misconduct alleged herein. Within months, the stock traded below $270, closing at $261.07 per share on July 29, 2025.

13. The truth emerged through a series of partial corrective disclosures in 2024, 2025, and 2026, including *The Wall Street Journal*'s February 21, 2025, revelation of a separate DOJ civil fraud investigation into the Company's Medicare Advantage billing practices; the Company's April 17, 2025 reduction of its 2025 profit forecast by more than $3 billion; the abrupt May 13, 2025 departure of its CEO, Defendant Andrew Witty, and suspension of guidance; the May 14, 2025 revelation of a DOJ criminal investigation; the July 2025 disclosures concerning $3.3 billion of earnings-"masking" "portfolio refinement" transactions; and the Company's July 24, 2025 confirmation of the criminal and civil probes. Each disclosure devastated the Company's stock price.

14. The states have now joined. On May 29, 2026, the Massachusetts Attorney General sued UnitedHealthcare, alleging that from 2015 through 2025 the Company falsely manipulated in-home health assessments of low-income seniors enrolled in MassHealth's Senior Care Options program, defrauding the state Medicaid program of at least $100 million, subject to trebling under the Massachusetts False Claims Act. (Complaint, Mass. AG Action).

15. On July 16, 2026, pursuant to Delaware law, including 8 *Del. C.* § 141(a) and Court of Chancery Rule 23.1, Plaintiff made a formal written demand on the Board to investigate, remedy, and commence legal proceedings to redress the misconduct alleged herein (the "**Demand**," attached hereto as **Exhibit A**).

16. On August 4, 2026, counsel for the Board responded, declining to act and instead deferring any action indefinitely, pending "further developments" in the Securities Class Action and seven other stockholder actions, based on the advice of an unnamed, informal "working group" of three directors and the "further discussion" of the full Board—including Defendant Hemsley, the principal wrongdoer identified in the Demand (the "**Response**," attached hereto as **Exhibit B**).

17. Later on August 4, 2026, Plaintiff objected in writing, demanding, among other things, that the Board preserve the Company's claims through tolling agreements by August 25, 2026, identify the working group and its counsel, and commit to triggering criteria and status reporting (the "**Objection**," attached hereto as **Exhibit C**).

18. On August 10, 2026, counsel for the nominal defendant responded on the Board's behalf to the Objection (the "**Supplemental Response**," attached hereto as **Exhibit D**). The response conceded, in substance, every deficiency the Objection identified.

19. ***First***, the Board refused to enter tolling agreements by the August 25, 2026 deadline Plaintiff set under 10 Del. C. § 8106, asserting instead that it was "not aware of any risk" of lapse because other stockholders had filed derivative actions asserting "the same claims," and invoking relation-back principles under *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 973 (Del. Ch. 2001). That reliance is misplaced and itself evidences bad faith. *Telxon* holds only that a board that *affirmatively realigns and takes control* of a timely-filed derivative claim may invoke its timeliness; it does not toll claims held in abeyance by a board that has made no decision, taken over no litigation, and committed to no timetable. The Board's position is also irreconcilable with the Company's own litigation conduct: the Company has expressed its intent to dismiss those very derivative actions as improperly brought, and cannot in good faith treat complaints which it contends are invalid as the instrument preserving the Company's claims.

20. ***Second***, while the Board finally identified the working group—directors McNabb, Montgomery Rice, and Flynn—it disclosed nothing about the group's mandate, delegated authority, independence review, or retention of counsel, and asserted blanket privilege over "[t]he materials provided to the working group," foreclosing any assessment of whether an investigation is occurring at all.

21. ***Third***, the Board again declined to articulate any criteria for when it would act on the Demand, promising only to continue to "monitor" the related actions—an open-ended deferral with no terminus.

22. ***Fourth***, the Board refused to substantiate its preservation efforts, offering only counsel's ipse dixit that efforts were "reasonable."

23. ***Finally***, the Board announced that it "reserves all rights, including objecting to any books and records demand" the Trust might make—a preemptive declaration of hostility to the very inspection rights that exist to police board inaction.

24. Taken together, the August 10 Supplemental Response confirms that the Board has not deferred action on the Demand pending investigation; it has declined to act at all, while claims run, records remain shielded, and the stockholder is told to wait indefinitely. That is a wrongful refusal in function if not in form. *See Rich ex rel. Fuqi Int'l, Inc. v. Chong*, 66 A.3d 963, 975–76 (Del. Ch. 2013).

25. As a result of the Individual Defendants' misconduct, the Company faces exposure to DOJ criminal and civil investigations and any resulting fines, penalties, and False Claims Act liability; state false claims act exposure, including the Commonwealth of Massachusetts's pending action; exposure in the Securities Class Action and related litigation; the loss of billions of dollars in market capitalization; a $3.65 billion guidance reduction attributable to unwinding the portfolio

refinement transactions; restitution and repayment obligations to CMS; a multi-billion-dollar overpayment for shares repurchased at artificially inflated prices; sustained congressional scrutiny; and severe reputational harm. Plaintiff brings this action to recover those damages for the Company and to secure the governance reforms necessary to prevent their recurrence.

## JURISDICTION AND VENUE

26. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "**Exchange Act**") (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b), 20(a), 20A, and 21D of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

27. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401, as well as pursuant to Section 27 of the Exchange Act, because: (*i*) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (*ii*) one or more of the Defendants either resides in or maintains executive offices in this District; and (*iii*) the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

28. Plaintiff is a current beneficial owner of UnitedHealth common stock, has continuously owned UnitedHealth common stock since 2005, and currently holds 3,000 shares of Company stock.

**Nominal Defendant**

29. Nominal Defendant UnitedHealth is a Delaware corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth's common stock is listed on the New York Stock Exchange ("**NYSE**") under the ticker symbol "UNH."

**Individual Defendants**

30. Defendant Stephen J. Hemsley ("**Hemsley**") has served as a member of the Board since 2000, as Chair of the Board since November 2019, and as the Company's CEO since May 2025. Hemsley previously served as CEO from 2006 to 2017 and as Executive Chair from 2017 to 2019. (*Collins* Compl. ¶ 16). During the Relevant Period, while in possession of material nonpublic information ("**MNPI**") concerning the Company's true business health, Hemsley sold approximately 286,900 personally held shares of UnitedHealth common stock for proceeds exceeding $155 million, including sales of more than $65 million on October 17, 2023 and more than $36 million on December 5, 2023—one week and eight weeks, respectively, after the Company received notice of the nonpublic DOJ antitrust investigation. (*Id*. ¶¶ 16, 97–98.) In its 2026 proxy statement, the Company disclosed that the Board departed from its long-standing practice of separating the CEO and Chair roles and formally combined both under Hemsley, and that the Board granted Hemsley a $60 million cliff-vesting stock option award. (UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2026)). At the Company's June 3, 2026 annual meeting, the Board opposed, and shareholders voted down, a shareholder proposal requesting that any Board Chair be independent. (Press Release, UnitedHealth Grp., UnitedHealth Group Updates on Annual Shareholder Meeting, Board Actions (June 3, 2026)). The Company provides Defendant Hemsley with significant compensation for his role a director of UnitedHealth.

The 2025 Proxy Statement notes that in 2024, Defendant Hemsley received $856,218 in total compensation.

31. From the period between September 22, 2021 and July 8, 2025 inclusive, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Hemsley made the following sales of Company common stock:

**Table 1: Hemsley Stock Sales**

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| Oct. 25, 2021 | 75,000 | $448.72 | $33,653,629.55 |
| Oct. 26, 2021 | 50,000 | $455.57 | $22,278,700.00 |
| July 26, 2022 | 99,312 | $534.27 | $53,059,223.62 |
| Oct. 17, 2023 | 121,515 | $540.58 | $65,688,590.85 |
| Dec. 5, 2023 | 66,081 | $550.39 | $36,370,196.04 |
| **Total:** | **411,908** | | **$211,550,340.06** |

32. Thus, in total, before the schemes were exposed, Hemsley sold 411,908 shares of Company common stock on inside information, for which he received over $211.5 million in proceeds.. His insider sales, made with knowledge of MNPI before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.[2] The inference that his sales were based MNPI is bolstered by the fact that Hemsley's only stock purchase during this almost-four-year period was on May 16, 2025, when he bought 86,700 shares on the open market for $288.57 per share – two days after being reappointed CEO and well after the stock price collapsed; and that he has made no additional stock sales as of the date of this Complaint

[2] Hemsley also gave an additional 246,634 shares of Company stock worth over $130 million as gifts in the period between December 21, 2021 and May 20, 2025 inclusive while in possession of MNPI. The Forms 4 associated with these gifts do not disclose the donee(s). Plaintiff intends to seek discovery into whether Hemsley took a charitable deduction for these gifts or gave them to an entity with which he is affiliated, and if merited, seek to amend this complaint accordingly.

33. Defendant Andrew P. Witty ("**Witty**") served as the Company's CEO and as a member of the Board from February 2021 until his abrupt departure on May 13, 2025, having previously served as an independent director from August 2017 to March 2018, when he stepped down to serve as CEO of Optum. (*Collins* Compl. ¶ 16; UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2022)). Following Witty's departure, the Board's Compensation and Human Resources Committee cancelled his outstanding performance-based restricted stock units. (UnitedHealth Grp. Inc., Current Report (Form 8-K) (June 2025)). From the period between September 22, 2021 and July 8, 2025 inclusive, while in possession of MNPI, Witty sold more than 21,500 personally held shares of UnitedHealth common stock for proceeds exceeding $11 million. (*Collins* Compl. ¶¶ 17, 97–98). The 2025 Proxy Statement notes that in 2024, Defendant Witty received $26,339,215 in total compensation.

34. During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Witty made the following sales of Company common stock:

**Table 2: Witty Stock Sales**

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| July 18, 2022 | 11,376 | $527.90 | $6,005,390.40 |
| April 27, 2023 | 6,160 | $487.49 | $3,002,949.49 |
| July 19, 2023 | 4,000 | $506.19 | $2,024,760.00 |
| **Total:** | **21,536** | | **$11,033,099.89** |

35. Thus, in total, before the schemes were exposed, he sold 21,536 shares of Company common stock on inside information, for which he received over $11 million in proceeds. His insider sales, made with knowledge of MNPI before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes. The

inference that his sales were based MNPI is bolstered by the fact that he has made no additional stock sales since.

36. Defendant John F. Rex ("**Rex**") served as the Company's CFO from 2016 until his replacement, announced on July 31, 2025—two days after the Company disclosed a $3.65 billion guidance reduction attributable to unwinding the portfolio refinement transactions—and effective September 2, 2025, when Rex became strategic advisor to the CEO. (Press Release, UnitedHealth Grp., UnitedHealth Group Announces Changes to Leadership Team (July 31, 2025)). The 2025 Proxy Statement notes that in 2024, Defendant Rex received $18,731,183 in total compensation.

37. Defendant Timothy J. Noel ("**Noel**") has served as CEO of UnitedHealthcare since January 2025 and previously led UnitedHealthcare's Medicare & Retirement business. On March 4, 2025, Noel assured Senator Charles E. Grassley, the Chairman of the Senate Judiciary Committee, in writing that *The Wall Street Journal*'s reporting on the Company's Medicare Advantage coding practices was "deeply flawed," that government audits confirm the accuracy of the Company's submissions, and that artificial intelligence plays no diagnostic role. (Letter from Tim Noel, CEO, UnitedHealthcare, to Sen. Charles E. Grassley, Chairman, S. Comm. on the Judiciary 1, 7 (Mar. 4, 2025) (the "**Noel Letter**")),

38. Defendant the Estate of Brian R. Thompson (the "**Thompson Estate**") is sued as successor in interest to Brian R. Thompson ("**Thompson**"), who served as CEO of UnitedHealthcare from April 2021 until his death on December 4, 2024, and previously as CFO of the Company's Medicare business. Specific personal representative or executor details for the private estate have not been publicly released or detailed in public probate court records.

39. From the period between September 22, 2021 and July 8, 2025 inclusive, while the Company's stock price was artificially inflated and before the schemes were exposed, Thompson made the following sales of Company common stock:

**Table 3: Thompson Stock Sales**

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| Feb. 16, 2025 | 28,943 | 521.00 | $15,079,303.00 |
| **Total:** | **28,943** | **521.00** | **$15,079,303.00** |

40. Thus, in total, before the schemes were exposed, Thompson sold 28,943 shares of Company Common Stock, for which he received over $15 million on February 16, 2024—eleven days before the DOJ antitrust investigation became public. The Form 4 relating to this sale indicates that it was not made pursuant to a Rule 10b5-1 trading plan. (*Collins* Compl. ¶¶ 16–17, 97–98). The inference that this sale was based MNPI is bolstered by the fact that earlier the same day, Thompson exercised 82,348 options from which the proceeds of 59,490 shares was withheld for cashless exercise and tax, meaning that his net proceeds from the exercise was 22,858 shares. Because Thompson sold 28,943 shares on that date, that means he sold 6,085 shares out of his standing holding in addition to the shares he yielded from exercising options. His February 16, 2024 sale amounted to 53.1% of his total holdings of the Company's common stock. Moreover, he had not sold any Company stock at all previously.

41. Defendant Richard T. Burke ("**Burke**") is a co-founder of the Company, served as CEO of UnitedHealthcare, Inc., the Company's predecessor, until 1988, and served as a member of the Board from 1977 until his retirement at the June 2022 annual meeting, including as Chairman of the Board from 2006 to August 2017 and as Lead Independent Director from September 2017 to October 2021. (UnitedHealth Grp. Inc., Definitive Proxy Statements (Schedule 14A) (2021, 2022)). The 2023 Proxy Statement notes that in 2022, Defendant Burke received

$572,512 in total compensation. From the period between September 22, 2021 and July 8, 2025 inclusive, while the Company's stock price was artificially inflated and before the schemes were exposed, Burke made the following sales of Company common stock:

**Table 4: Burke Stock Sales**

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| Nov. 23, 2021 | 2,500 | $444.70 | $1,111,750.00 |
| Nov. 24, 2021 | 2,500 | $450.00 | $1,125,000.00 |
| Jan. 20, 2022 | 5,000 | $469.41 | $2,347,044.00 |
| Jan. 21, 2022 | 4,000 | $468.50 | $1,874,000.00 |
| Feb. 16, 2022 | 5,000 | $476.62 | $2,383,587.50 |
| Feb. 23, 2022 | 4,000 | $465.30 | $1,861,182.40 |
| Feb. 25, 2022 | 6,000 | $470.38 | $2,822,305.20 |
| Mar. 22, 2022 | 4,000 | $511.14 | $2,044,567.60 |
| Mar. 23, 2022 | 3,000 | $505.67 | $1,517,001.10 |
| Mar. 24, 2022 | 3,000 | $508.80 | $1,526,400.00 |
| May 16, 2022 | 2,500 | $493.25 | $1,233,125.00 |
| May 17, 2022 | 2,500 | $493.50 | $1,233,750.00 |
| May 19, 2022 | 2,500 | $478.96 | $1,197,410.50 |
| **Total:** | **46,500** | | **$22,277,123.20** |

42. Thus, in total, before the schemes were exposed, Burke sold 46,500 shares of Company Common Stock, for which he received over $22 million in proceeds. The Form 4s relating to these sales indicate that they were not made pursuant to a Rule 10b5-1 trading plan.

43. Defendant Charles D. Baker ("**Baker**"), the former Governor of Massachusetts and former CEO of Harvard Pilgrim Health Care, was appointed to the Board unanimously in October 2023—the same month the Company received notice of the nonpublic DOJ antitrust investigation—and was first elected by shareholders at the June 2024 annual meeting. Baker has served on the Audit and Finance Committee and the Health and Clinical Practice Policies Committee since his appointment. (Press Release, UnitedHealth Grp., Charlie Baker Joins UnitedHealth Group's Board of Directors (Nov. 3, 2023); UnitedHealth Grp. Inc., Definitive Proxy

Statement (Schedule 14A) (Apr. 2024); *Collins* Compl. ¶¶ 18–25, 57, 107)). The 2025 Proxy Statement notes that in 2024, Defendant Baker received $366,072 in total compensation.

44. Defendant Timothy P. Flynn ("**Flynn**") has served as a member of the Board since 2017. Flynn previously served as Chairman of KPMG International. (*Collins* Compl. ¶¶ 18–25; UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (2021)). The 2025 Proxy Statement notes that in 2024, Defendant Flynn received $400,765 in total compensation.

45. Defendant Paul R. Garcia ("**Garcia**") has served as a member of the Board since 2021, when he was appointed following the June 2021 annual meeting and thereafter first elected by shareholders at the June 2022 annual meeting, and has served as a member of the Audit and Finance Committee during the Relevant Period. Garcia is the former CEO and Chairman of Global Payments Inc. (*Collins* Compl. ¶¶ 18–25, 57, 107; UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2022)). The 2025 Proxy Statement notes that in 2024, Defendant Garcia received $366,567 in total compensation.

46. Defendant Kristen L. Gil ("**Gil**") has served as a member of the Board since 2022, when she was appointed following the June 2022 annual meeting and thereafter first elected by shareholders at the June 2023 annual meeting, and has served as a member of the Audit and Finance Committee during the Relevant Period. Gil is Vice President and Business Finance Officer of Alphabet Inc. (*Collins* Compl. ¶¶ 18–25, 57, 107; UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2023)). The 2025 Proxy Statement notes that in 2024, Defendant Gil received $514,769 in total compensation.

47. Defendant Scott Gottlieb, M.D. ("**Gottlieb**") has served as a member of the Board since November 18, 2025, joining after the principal misconduct alleged herein, and was re-elected at the Company's June 3, 2026 annual meeting. (UnitedHealth Grp. Inc., Definitive Proxy

Statement (Schedule 14A) (Apr. 2026); Press Release, UnitedHealth Grp., UnitedHealth Group Updates on Annual Shareholder Meeting, Board Actions (June 3, 2026); Press Release, UnitedHealth Grp., Scott Gottlieb, M.D., Joins UnitedHealth Group Board of Directors (Nov. 18, 2025)). Gottlieb is named as a defendant solely in his capacity as a member of the Board that received and wrongfully refused the Demand.

48. Defendant Michele J. Hooper ("**Hooper**") served as a member of the Board from 2007 until the June 3, 2026 annual meeting, at which she did not stand for re-election, and served as Lead Independent Director from October 2021 until June 3, 2026. (*Collins* Compl. ¶¶ 18–25; UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2022)). The 2025 Proxy Statement notes that in 2024, Defendant Hooper received $441,349 in total compensation.

49. Defendant F. William McNabb III ("**McNabb**") has served as a member of the Board since 2018 and as Chair of the Audit and Finance Committee during the Relevant Period. McNabb is the former Chairman and CEO of The Vanguard Group, Inc. (*Collins* Compl. ¶¶ 18–25, 57, 107). The 2025 Proxy Statement notes that in 2024, Defendant McNabb received $393,602 in total compensation.

50. Defendant Valerie Montgomery Rice ("**Montgomery Rice**") has served as a member of the Board since 2017. Montgomery Rice is the President and CEO of Morehouse School of Medicine. (*Collins* Compl. ¶¶ 18–25). The 2025 Proxy Statement notes that in 2024, Defendant Montgomery Rice received $424,262 in total compensation.

51. Defendant John H. Noseworthy ("**Noseworthy**") has served as a member of the Board since 2019. Noseworthy is the former President and CEO of Mayo Clinic. (*Collins* Compl. ¶¶ 18–25). The 2025 Proxy Statement notes that in 2024, Defendant Noseworthy received $390,756 in total compensation.

52. Defendants Hemsley, Witty, Rex, Noel, and the Thompson Estate are referred to herein as the "**Officer Defendants**."

53. Defendants Hemsley, Witty, Burke, Baker, Flynn, Garcia, Gil, Gottlieb, Hooper, McNabb, Montgomery Rice, and Noseworthy are referred to herein as the "**Director Defendants**."

54. The Officer Defendants and the Director Defendants are collectively referred to herein as the "**Individual Defendants**" and, together with UnitedHealth, the "**Defendants**."

55. Defendants Hemsley, Witty, Burke, and the Thompson Estate are referred to herein as the "**Insider Trading Defendants**."

56. The "**Demand Defendants**" consist of the nine members of the Board at the time of the Demand and its refusal, each re-elected at the Company's June 3, 2026 annual meeting: (*i*) Baker, (*ii*) Flynn, (*iii*) Garcia, (*iv*) Gil, (*v*) Gottlieb, (*vi*) Hemsley, (*vii*) McNabb, (*viii*) Montgomery Rice, and (*ix*) Noseworthy. (Press Release, UnitedHealth Grp., UnitedHealth Group Updates on Annual Shareholder Meeting, Board Actions (June 3, 2026)).

**Relevant Non-Parties**

57. Relevant non-party UnitedHealthcare is a Delaware corporation and a wholly owned subsidiary of the Company. Together with UnitedHealthcare's operating subsidiaries—including United HealthCare Services, Inc., a Minnesota corporation—UnitedHealthcare comprises the Company's insurance platform, through which the Company offers, among other products, Medicare Advantage plans under contracts with CMS. The risk-adjustment submissions at the heart of this action—including the diagnosis codes generated through HouseCalls in-home assessments, chart reviews, and the coding practices detailed herein—were made to CMS by or on behalf of UnitedHealthcare subsidiaries and inflated the capitated payments those subsidiaries received. UnitedHealthcare and its subsidiaries are not named as defendants. References herein to

"UnitedHealthcare" are to the Company's insurance platform as a whole unless otherwise indicated.

58. Relevant non-party Optum is a Delaware corporation and a wholly owned subsidiary of the Company. The Company formed Optum in 2011 by consolidating its pharmacy and care-delivery businesses under a single brand, and Optum now operates through three principal businesses: (*i*) Optum Health, the Company's care-delivery arm, which employs or affiliates with approximately 90,000 physicians; (*ii*) Optum Insight, its data, analytics, and technology business; and (*iii*) Optum Rx, its pharmacy benefit manager. As alleged herein, Optum entities performed functions central to the misconduct at issue, including conducting HouseCalls in-home health risk assessments, operating the chart-review programs, and deploying the coding-prompt technology that generated the unsupported diagnosis codes submitted to CMS, and Optum Rx is a subject of the Department of Justice's expanded criminal investigation. References herein to "Optum" are to the Company's health-services platform as a whole unless otherwise indicated.

59. Because UnitedHealthcare and Optum are wholly owned by the Company, the harm alleged herein—including the overpayments subject to recoupment, treble damages exposure under the False Claims Act, and the costs of the governmental investigations described below—falls ultimately on the Company and its stockholders, on whose behalf Plaintiff brings this action.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

60. By reason of their positions as officers, directors, and/or fiduciaries of UnitedHealth and because of their ability to control the business and corporate affairs of UnitedHealth, at all relevant times the Individual Defendants owed UnitedHealth and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner. The Individual

Defendants were required to act in furtherance of the best interests of UnitedHealth and its stockholders and not in furtherance of their personal interest or benefit.

61. The Individual Defendants, because of their positions of control and authority as directors and/or officers of UnitedHealth, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with UnitedHealth, each of the Individual Defendants had knowledge of MNPI regarding the Company.

62. To discharge their duties, the officers and directors of UnitedHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of UnitedHealth were required to, among other things: (a) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner; (b) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, including the laws governing Medicare Advantage risk adjustment and the antitrust laws; (c) exercise good faith to ensure that the Company's communications with the public and with stockholders were made with due candor in a timely and complete fashion; and (d) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

63. UnitedHealth's Audit and Finance Committee, which during the Relevant Period included McNabb (Chair), Baker, Garcia, and Gil, is responsible under its charter for, among other things, assisting the Board in fulfilling its oversight responsibilities relating to the conduct and integrity of the Company's financial reporting, the Company's compliance with legal and

regulatory requirements, and the efficacy of the Company's enterprise risk management structure and key processes. Its charter further requires the Audit and Finance Committee to review the Company's enterprise risk management framework, including the processes for identifying, managing, monitoring, and reporting significant risks; meet periodically with management concerning significant risks and the "steps management has taken to monitor, control or mitigate such risks;" oversee the Company's "management of litigation, investigations or other legal or regulatory proceedings;" receive and review reports concerning compliance with legal and regulatory requirements; assess the effectiveness of the Company's policies, procedures, and resource commitments concerning compliance and ethics; and report regularly to the Board concerning significant issues considered by the Committee. (UnitedHealth Group, Audit and Finance Committee Charter at 1, 4–6 (Nov. 6, 2025)).

64. The Company's Code of Conduct, which expressly applies to directors, provides that directors "must act with integrity" and "oversee the process of ensuring that all books, records, accounting, and reporting are accurate and complete." The Code further requires the prompt reporting of suspected legal, regulatory, or policy violations; cooperation with investigations and lawsuits; and the provision of timely, accurate, truthful, and complete information and documentation. It also recognizes a shared responsibility to prevent and combat fraud, waste, and abuse within the healthcare system. (UnitedHealth Group, Code of Conduct: Our Principles of Ethics & Integrity at 6, 9, 13).

65. Because oversight of Medicare Advantage billing compliance and antitrust compliance is mission critical to the Company's vertically integrated business model, the Individual Defendants' fiduciary duties required them to implement and monitor a reasonable, Board-level system of reporting concerning those functions, and to respond to red flags concerning

them. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996); *Marchand*, 212 A.3d at 824. These oversight obligations extended across both of UnitedHealth's principal businesses. UnitedHealthcare's insurance operations and Optum's care-delivery, pharmacy-benefit-management, data-analytics, technology, and healthcare-services operations functioned as complementary components of a single vertically integrated enterprise under the common ownership and control of UnitedHealth. Optum also provided services to UnitedHealthcare's insurance competitors, healthcare providers, employers, and governmental entities. Accordingly, the Individual Defendants were required to oversee not only each business individually, but also the operational, financial, data-sharing, referral, and competitive relationships between UnitedHealthcare and Optum. The scope of Optum's operations, its close integration with UnitedHealthcare, and its importance as a source of revenue and profits for UnitedHealth made effective Board-level monitoring of Medicare billing, antitrust compliance, regulatory compliance, and conflicts arising from the Company's simultaneous roles as insurer, healthcare provider, pharmacy-benefit manager, and healthcare-technology vendor essential to the Company's operations.

## SUBSTANTIVE ALLEGATIONS

### A. The Company Built a Vertically Integrated Structure to Circumvent the ACA's Medical Loss Ratio Requirements

66. The ACA's MLR requirements obligated insurers to spend a greater percentage of premiums on actual healthcare rather than administrative costs or profits. UnitedHealth responded by launching Optum in April 2011 and spending more than $60 billion on vertical expansion. That structure permitted UnitedHealthcare to collect premiums, direct patients to Optum Health providers, and pay itself for the care required to satisfy the MLR floor, thereby retaining profits on both sides of the ledger.

67. The Company's vertical integration placed regulatory compliance at the core of its business model. The Company's Medicare Advantage franchise depends on risk-adjusted payments from CMS, and its Optum businesses transact with, and hold data concerning, the Company's insurance competitors. Oversight of Medicare billing compliance and antitrust compliance was therefore a mission-critical function of the Board throughout the Relevant Period.

## B. Management Orchestrated a Company-Wide Medicare Advantage Upcoding Scheme

68. Under the Medicare Advantage program, CMS pays private insurers capitated, risk-adjusted payments that increase with the number and severity of enrollee diagnoses. The Securities Class Action alleges, on the strength of confidential witness accounts, whistleblower disclosures, and analyses of CMS data, that management formulated and oversaw a Company-wide scheme to upcode Medicare Advantage members—to diagnose members with conditions that made them appear sicker and caused Medicare to overpay the Company. UnitedHealth's integrated structure allowed UnitedHealthcare's Medicare Advantage insurance operations to draw upon Optum's care-delivery, in-home-assessment, data, and technology capabilities in carrying out the Company's diagnosis-capture practices.

69. The mechanisms used to perpetuate the scheme included: (*i*) bonuses to providers who upcoded; (*ii*) training on "buddy codes;" (*iii*) the HouseCalls in-home assessment program; (*iv*) software programmed to recommend lucrative diagnoses; and (*v*) unreliable medical devices prone to false positives. HouseCalls operates as part of Optum Health's direct care-delivery and population-health-management business and conducts in-home health assessments of UnitedHealthcare members. Through HouseCalls, UnitedHealth's health-services subsidiary directly participated in evaluating members whose diagnoses affected the risk-adjusted payments received by the Company's insurance business.

70. According to an analysis of Medicare data by *The Wall Street Journal*, in 2021 alone UnitedHealth collected $8.7 billion in taxpayer funds for diagnosis codes that no doctor treated.

**C. Federal Watchdogs Repeatedly Confirmed the Misconduct**

71. In February 2017, the DOJ intervened in the *Qui Tam* action filed in 2011 by Benjamin Poehling, a former finance director of the Company's Medicare business, and filed a complaint alleging that the Company's national Chart Review Program operated as a one-way revenue engine: the Company mined millions of patient charts each year to capture additional diagnosis codes worth billions in incremental risk-adjustment payments, while in bad faith ignoring what those same reviews revealed—namely, that many codes the Company had already submitted to CMS lacked support in the medical records. (*Qui Tam* Compl. ¶¶ 8–10, 21).

72. The Company's management knew since at least 2005 that a significant percentage of provider-reported diagnoses were invalid; presentations to senior executives reported that more than thirty percent of coded conditions failed CMS validation. (*Id*. ¶¶ 10, 93). The Chart Review Program was spectacularly profitable, returning $270 million on an $18 million investment in 2006 alone and generating more than $3 billion in payments for payment years 2010 through 2015; when coding revenue targets were missed, senior executives loosened coding policies and ordered nearly a million charts re-coded. (*Id*. ¶¶ 129–31, 133).

73. The *Qui Tam* Complaint's most consequential allegations reach Defendant Hemsley, who now chairs the Board and serves as CEO. The DOJ alleged that a June 2010 internal report prepared for then-CEO Hemsley and his executive team flagged False Claims Act compliance in risk adjustment as an issue of immediate concern; that a November 2011 presentation created for Hemsley described compliance as the true value of claims verification

while acknowledging that examining the medical record carried negative revenue consequences; and that mid-2010 federal audits had found risk scores invalid for 45 percent and 43 percent of audited beneficiaries in California and Texas, respectively. (*Id.* ¶¶ 111–12, 145).

74. When the Company's own Claims Verification pilot program confirmed the problem—over half the records in the first phase showed unsupported provider diagnoses, the third phase found 33.6 percent of audited condition categories unsupported, and the Company booked a $208 million repayment accrual—executives terminated the program in 2014 rather than delete the codes, reversing more than $250 million in accruals to close a $500 million budget shortfall. (*Id.* ¶¶ 115–16, 165–66, 176, 178, 189).

75. The DOJ alleged that Hemsley was consulted on the termination, directed a subordinate to place calls to the CMS Administrator in search of cover, and backed the decision even after an April 29, 2014 meeting at which CMS warned the Company of its False Claims Act exposure and its duty to delete invalid codes: "Hemsley could have reversed this decision but instead he supported it." (*Id.* ¶¶ 172, 180–85, 190). Thompson, then CFO of the Medicare business, received the accrual estimates, raised the accrual by $29 million, and then ordered the verification work stopped; an internal document that year acknowledged that 2014 earnings benefited from the one-time policy change while investors remained unaware of it. (*Id.* ¶¶ 173–76, 193).

76. The result, per DOJ: at least 100,000 diagnoses the Company itself had identified as invalid were never deleted, more than 900,000 invalidated codes remained in CMS's systems across payment years 2011 through 2014, and Part C damages alone exceeded $1.1 billion—all while executives signed annual attestations certifying the accuracy of the Company's risk-adjustment submissions. (*Id.* ¶¶ 191, 194–95, 230–33).

77. On March 3, 2025, a Special Master recommended summary judgment for the Company on the government's reverse false claims theory for failure of proof. (*Qui Tam* Action, ECF No. 631). The government moved for review of the recommendation on April 2, 2025, members of Congress were granted leave to file an *amicus curiae* brief in support of the motion, and the motion was taken under submission on November 19, 2025. (*Id.*, ECF Nos. 636, 640, 643). The Special Master's recommendation adjudicated an evidentiary failure on a repayment theory; it did not address the diagnosis-capture practices catalogued in the Grassley Report, which were not before that court, and it does not diminish what the *Qui Tam* Complaint establishes for present purposes: notice. From February 2017 forward—and from 2010 forward as to Hemsley personally—the Board governed a company formally accused by the United States of inflating the very revenue engine at issue here.

78. The OIG independently placed the Company on notice. A September 2021 OIG report found that UnitedHealth disproportionately leveraged chart reviews and health risk assessments to drive risk-adjusted payments, capturing 40% ($3.7 billion) of all such CMS payments in 2017 while enrolling only 22% of Medicare Advantage members. A follow-on October 2024 OIG report—which found that UnitedHealth "stood out from its peers" in using in-home visits and chart reviews to generate payments—found the practice continued through 2023, with UnitedHealth alone receiving an estimated $3.7 billion of the $7.5 billion in risk-adjusted payments generated industry-wide that year by diagnoses reported only on health risk assessments and HRA-linked chart reviews, including approximately two-thirds of the payments attributable to in-home assessments and linked chart reviews.

**D. The Grassley Report Confirms the Upcoding Scheme Was Corporate Policy**

79. On January 12, 2026, the Senate Judiciary Committee released the Grassley Report, a majority staff analysis of the Company's risk adjustment practices built entirely on the Company's own internal documents—more than 50,000 pages of training materials, policies, software documentation, and audit tools produced in response to congressional oversight demands. The Grassley Report concludes that the Company "turned risk adjustment into a major profit centered strategy" contrary to the program's original intent, and that the Company leverages its size, vertical integration, and data analytics capabilities to stay ahead of CMS's efforts to counteract excessive coding intensity. (Grassley Report at 2). The Committee simultaneously released the underlying Bates-stamped internal Company documents; citations herein to "UHG-SJC" numbers are to that production.

80. The Grassley Report quantifies the degree to which UnitedHealth is an outlier among Medicare Advantage organizations ("**MAOs**"). Synthesizing prior investigations by HHS-OIG, *The Wall Street Journal*, STAT News, and academic researchers, the Grassley Report finds that: (*i*) the average risk score at UnitedHealth was estimated to be 28 basis points higher than fee-for-service Medicare, versus only 19 basis points higher for Medicare Advantage overall—a difference in coding intensity translating to $643 more per member per year to UnitedHealth than to MAOs on average, and an estimated $1,863 per member in differential-coding revenue versus an industry average of $1,220; (*ii*) UnitedHealth received nearly two-thirds of all payments to MAOs for diagnoses reported *only* on in-home health risk assessments and assessment-linked chart reviews, sixty percent of UnitedHealth's in-home assessments generated at least one new revenue-producing diagnosis, and UnitedHealth earned approximately $2,735 per assessment versus $1,525 for Humana and $232 for CVS/Aetna; (*iii*) UnitedHealth enrollees had much higher rates

of diagnosis codes for targeted chronic conditions than MAOs overall, including diabetic cataracts, morbid obesity, heart failure, emphysema, senile purpura, peripheral artery disease, secondary hyperaldosteronism, alcohol dependence, and malnutrition; and (*iv*) the average risk score for UnitedHealth Medicare Advantage enrollees treated by UnitedHealth-affiliated providers was 1.65, versus 1.31 for UnitedHealth enrollees without UnitedHealth providers, and risk scores for fee-for-service beneficiaries switching into UnitedHealth Medicare Advantage *with* UnitedHealth providers increased by about 55 percent, versus about 30 percent for those switching without UnitedHealth providers. (Grassley Report at 21–22 & nn.104–13).

81. The engine of this outlier performance is data. The Grassley Report finds that the Company has curated de-identified healthcare data on more than 88 percent of Americans—significantly more Americans than UnitedHealthcare insures—and describes, in the Company's own words, "one of the most robust datasets in the market, with over 1,800 sources, 18 billion unique claims and 300 million lives covered nationally." The Company's acquisition of Change Healthcare—announced in 2021 and completed in 2022—a clearinghouse for 15 billion medical claims each year accounting for nearly 40 percent of all claims, further expanded those data assets, and the Company pairs them with artificial intelligence and natural language processing to identify which enrollees carry diagnoses not yet captured on claims and the best mechanism—pay-for-coding, in-home assessment, or chart review—to capture them. (*Id.* at 25–26). Change Healthcare's assets form part of Optum Insight, the Optum business that provides data analytics, healthcare technology, software, consulting, and managed services to health plans, healthcare providers, governmental entities, and life-sciences companies. Optum Insight's access to data extending far beyond UnitedHealthcare's own membership illustrates how the Company's services and insurance businesses operate together within UnitedHealth's vertically integrated structure.

82. The Grassley Report's first finding establishes that the upcoding scheme alleged in the Securities Class Action was embedded in the Company's corporate infrastructure. The Company maintains a dedicated diagnosis-capture workforce: HouseCalls nurse practitioners who completed 2.9 million in-home visits in 2024; medical coders who perform secondary chart reviews of external records; external physicians paid bonuses through the Medical Condition Assessment Incentive Program to assess enrollees for Company-suspected conditions; and approximately 90,000 affiliated physicians—nearly 9% of the United States physician workforce—whose diagnostic workflows the Company controls. (*Id.* at 3, 27, 38–48). The HouseCalls program operates through Optum Health, which provides direct care delivery, population-health management, chronic-condition management, and in-home health assessments. Thus, the Company used personnel and services within Optum's care-delivery business to generate diagnoses that increased risk-adjusted payments received through UnitedHealthcare's Medicare Advantage insurance business.

83. The Grassley Report details how the Medical Condition Assessment Incentive Program ("**MCAIP**") converts independent physicians into instruments of the Company's diagnosis-capture strategy. Participating providers give Company employees access to their patients' medical records; the Company mines those records against its data assets and furnishes each provider a list of "suspected medical conditions" before the care visit—on paper, through the UnitedHealthcare Provider portal, or directly into the provider's electronic medical record; and the provider is expected to assess the enrollee for each suspected condition and, if the provider "determines that the Suspect Medical Condition is present, [the] Provider must timely submit a claim that includes the complete and accurate ICD-10-CM code(s)." MCAIP providers may be required to attend Company-designed trainings on documentation and coding—delivered through

Optum Health Education, a nationally accredited continuing-education provider—and the Company may reduce or withhold a provider's incentive payments if the provider does not attend within a specified timeframe. Providers are shown individualized dashboards benchmarking their diagnostic and coding patterns against national averages, and the MCAIP program alone offers three separate bonus opportunities, on top of ordinary reimbursement and additional bonuses for conducting annual wellness visits, with higher bonuses for "high priority" enrollees. (*Id.* at 43–47). These care-delivery operations form part of Optum Health, which operates or partners with primary-care, specialty-care, and urgent-care locations, ambulatory surgery centers, home-health and hospice providers, and other healthcare facilities and services. Optum Health's expansion gave UnitedHealth control over an extensive provider network capable of directing and standardizing the diagnostic practices applied to UnitedHealthcare members.

84. The Grassley Report also traces the deliberate construction of the vertically integrated provider network through which the Company controls diagnostic workflows: the $4.6 billion acquisition of DaVita Medical Group in 2018, the $3.5 billion acquisition of Landmark Health—the nation's largest risk-bearing home-based medical group—in 2021, and the $236 million acquisition of Atrius Health in 2022, among others. As of May 2024, the Company employed approximately 9,000 physicians and was affiliated with approximately 90,000 physicians; it has advertised itself as "becoming the nation's largest employer of nurse practitioners," with more than 4,000 advanced practice clinicians in the HouseCalls program alone, and its providers work in over 1,900 skilled nursing facilities and 900 senior living communities. (*Id.* at 47–48).

85. As detailed in the Grassley Report, the Company arms this workforce with curated healthcare data on more than 88 percent of Americans and deploys artificial intelligence

throughout the chart-review process. (*Id.* at 26, 39–40). The eHouseCalls software prepopulates suspected diagnoses into a diagnosis confirmation page, applies logic rules that automatically populate revenue-generating codes, and requires clinicians to document a reason for removing any proposed diagnosis—corroborating the Securities Class Action's allegations that Company software was programmed to recommend lucrative diagnoses. (*See* Grassley Report at 30–32).

86. As detailed in the Grassley Report, a multi-layered enforcement apparatus disciplines clinicians who diagnose below average, including the Cohort Program of individualized retraining and weekly management meetings, ride-along audits that review failures to identify diagnoses, documentation audits that deduct points for under-diagnosing, and manual and automated queries directing providers to reconsider missed diagnoses. (*Id.* at 32–34).

87. The Grassley Report's second finding catalogues the diagnostic strategies themselves, organizing the Company's targeted-diagnosis playbook into four categories: (*i*) "screening opportunities"—deploying new screening tools or expanded screening recommendations to capture diagnoses in broader populations (e.g., screening for peripheral vascular disease using a QuantaFlo device); (*ii*) "probability-based coding opportunities"—diagnosing from signs, symptoms, and risk factors rather than definitive testing (e.g., diagnosing COPD from symptoms and tobacco history rather than diagnostic spirometry); (*iii*) "coding proliferation opportunities"—capturing secondary diagnoses that map to a different payment category than the primary diagnosis but do not empirically add to costs (e.g., secondary hyperaldosteronism in heart failure or cirrhosis); and (*iv*) "discretionary coding opportunities"—capturing diagnoses lacking well-defined diagnostic thresholds (e.g., morbid obesity at a BMI of 35–39.9) or that are not medically significant or are transitory (e.g., senile purpura). (Grassley Report at 51). The Company trains its HouseCalls, pay-for-coding, and integrated providers to

routinely assess enrollees for these targeted diagnoses using the Company's circumscribed assessment guidelines and diagnostic criteria, and enforces adherence through embedded software workflows, audits and queries, benchmarking, and incentive payments. (*Id.*).

88. The Grassley Report's flagship "screening opportunity" example is the Company's mass deployment of the QuantaFlo, a four-minute photoplethysmography device manufactured by Semler Scientific, to capture asymptomatic peripheral artery disease ("**PAD**") diagnoses. The U.S. Preventive Services Task Force has found "inadequate evidence" that: (*i*) screening asymptomatic patients for PAD yields clinically important benefits; (*ii*) fee-for-service Medicare generally does not reimburse PAD screening in asymptomatic patients and does not approve the QuantaFlo for reimbursement; (*iii*) the device has received no major clinical endorsements; and (*iv*) the clinical trial reports the Company supplied to Senator Grassley in support of its screening program involved researchers funded by Semler itself. Semler, meanwhile, has advertised its devices to insurers since 2013 as a way to boost risk scores in capitated programs, and by 2019 was grossing approximately $33 million per year—49 percent from a single customer, "a U.S. diversified healthcare company and its affiliated plans." CMS has since removed asymptomatic and less severe PAD diagnoses from the current risk model (V28)—a regulatory acknowledgment that the codes the Company's screening program was built to capture did not empirically predict cost. (Grassley Report at 57–62).

89. The Company's guidance to its providers concerning how to code medical conditions for billing purposes ranges across virtually every payable condition category. To say the least, it is aggressive to the extreme. For a period, the Company directed its HouseCalls providers to code "diabetes with diabetic cataracts" for patients whose cataracts had already been surgically removed—a diagnosis the sitting CMS Administrator testified would be anatomically

impossible. (Grassley Report at 55–56). The Company also screened non-diabetic enrollees for diabetes using a point-of-care device whose own product insert states it is not intended for the screening or diagnosis of diabetes. (*Id.* at 67–68). The Company taught its providers to diagnose atrial fibrillation from the presence of an anticoagulant prescription without an electrocardiogram; to diagnose heart failure from a symptom checklist while omitting the checklist's own limiting instruction; to capture chronic obstructive pulmonary disease ("**COPD**") before confirmatory spirometry; to diagnose secondary hyperaldosteronism without laboratory testing; and to code opioid dependence for enrollees taking prescription opioids exactly as directed. (*Id.* at 73–76, 81–83, 88–92).

90. The 50,000 pages of documents the Company produced to the Senate Judiciary Committee speak for themselves; each is stamped "Highly Confidential," and each is now public. A HouseCalls quality assurance guide instructs auditors that a diagnosis of diabetes with diabetic cataracts "should remain ACTIVE s/p cataract surgery/removal" and that charts for members post cataract removal should be returned so the diagnosis of "Diabetes with Complications-Cataracts" can be added to the diagnosis confirmation page. (OptumCare, *HouseCalls QA Clarification Guide for Clinical QA Specialists*, UHG-SJC-037126).

91. A practitioner job aid shows that managers conducting ride-along audits grade clinicians on a rubric that deducts five percent for each of the first four "Minor Diagnoses Missed"—a checklist naming COPD, diabetes, vascular disease, cardiac arrhythmia, major depressive disorder, morbid obesity, neuropathy, and heart failure. (Optum, *Ride Along Expectations: Practitioners Job Aid* (Jan. 26, 2022), UHG-SJC-005340, at UHG-SJC-005342).

92. A clinical tip sheet teaches that a clinician's determination of physical dependence, without more, "is enough to make a substance use disorder diagnosis of dependence," independent

of DSM-5 criteria, and its model case study codes opioid dependence for a member with a DSM-5 score of zero who takes oxycodone exactly as prescribed for trigeminal neuralgia. (Optum, *Substance Use Disorders (SUD)* (July 20, 2021), UHG-SJC-003206, at UHG-SJC-003207-3211). A companion tip sheet directs that the eHouseCalls tablet will generate a stable angina diagnosis from the mere presence of nitrate medications such as nitroglycerin, Ranexa, Imdur, and Isordil. (Optum, *Angina Pectoris* (Apr. 30, 2019), UHG-SJC-011303, at UHG-SJC-011305). And the training deck governing HouseCalls visits confirms that a Smart Logic rule populates unspecified atrial fibrillation into the diagnosis cart whenever the clinician selects a single physical examination checkbox. (Optum, *HouseCalls Visit: Putting the Puzzle Together* (2019), UHG-SJC-037513).

93. The coding education the Company delivers to its coders and providers is to the same effect. A continuing education deck teaches that a chart note recording "smoker's cough" is coded as simple chronic bronchitis (J41.0), and its example re-codes a physician's non-payable cough code into chronic bronchitis under the banner of improving accuracy and completeness. (Optum, *Coding COPD, Arrhythmia and Vascular Disease for Medicare Advantage* (2021), UHG-SJC-047699–700). Of course, this also results in a payable event for the Company. A companion deck converts a progress note recording a four-pound weight loss and intermittent appetite in a patient who "[l]ooks thin" into a diagnosis of protein-calorie malnutrition (E46), displacing the physician's own professional judgment. (Optum, *Coding Major Depressive Disorder, Obesity, and Protein Calorie Malnutrition for Medicare Advantage* (2022), UHG-SJC-047811). A polyneuropathy reference instructs that "[a]ny patient with cancer should be suspected to have a polyneuropathy until proven otherwise" and maps that suspicion to the payable code for

polyneuropathy in diseases classified elsewhere (G63.0). (OptumCare, *Polyneuropathy Quick Reference* (Sept. 7, 2017), UHG-SJC-036898–99).

94. The Company also instructs its providers that the same diagnoses which raise risk scores remove enrollees from quality oversight: its coding instructions walks providers through the HEDIS frailty and advanced-illness exclusions, under which members coded with conditions such as age-related cognitive decline, oxygen dependence, and gait abnormality are excluded from quality measures altogether. (*Coding COPD, Arrhythmia and Vascular Disease*, *supra*, at UHG-SJC-047727–28). The diagnosis-capture machine thus serves two ends at once: higher capitated payments and lower quality-compliance exposure.

95. Other documents produced to the Senate Judiciary Committee show that the Company training its clinicians to multiply diagnoses reflexively and to carry them forward in perpetuity. A 2021 training presentation on secondary immunodeficiency instructs providers that "you do not need to 'see' an infection or malignancy before you can diagnose SID" and that the diagnosis should be documented for any enrollee whose condition or medication merely *may* cause immunodeficiency. (Optum, *Secondary Immunodeficiency* (2021), UHG-SJC-047309, at UHG-SJC-047310). A companion tip sheet teaches that secondary hyperaldosteronism "does not require an aldosterone level or other labs" and should be considered whenever a heart failure or cirrhosis patient has edema or takes a loop diuretic or spironolactone. (Optum, *Heart Failure and Secondary Hyperaldosteronism* (May 19, 2021), UHG-SJC-047895-47896). A 2024 training deck declares that "[a]ll patients with atrial fibrillation have a secondary prothrombotic or a hypercoagulable state," that coagulation testing is unnecessary, and that clinicians should search eHouseCalls for other thrombophilia, which codes to secondary hypercoagulable state. (Optum, *Diagnosing During a HouseCalls Visit: Putting the Pieces Together* (2024), UHG-SJC-036980). A tip sheet

designating heart failure, COPD, atherosclerosis, and "many psychiatric conditions, even single episode" as lifelong diagnoses supplies the infrastructure for recapturing the same codes—and the same payments—year after year. (Optum, *HouseCalls Conditions Unlikely to Resolve* (2022), UHG-SJC-030107).

96. The Grassley Report documents the same pattern for dementia—a diagnosis CMS removed from the risk model in 2014 over upcoding concerns and reintroduced in 2020 with deliberately constrained payment factors "to limit any effect that clinical discretion may have in payment." The Company embedded the Mini-Cog—a brief screen involving recall of three words and drawing a clock face—into the eHouseCalls system as mandatory for all enrollees; a logic rule populates a dementia diagnosis into the diagnosis cart when the provider checks a "dementia" checkbox; and the HouseCalls quality assurance team has been instructed that an abnormal Mini-Cog on its own, without any other supporting information, is enough to support a dementia diagnosis—notwithstanding NIH/Alzheimer's Association criteria requiring impairment across multiple domains that interferes with daily functioning, confirmed through a full diagnostic evaluation. (Grassley Report at 98–99). Researchers found that annual incident dementia diagnosis rates in Medicare Advantage increased by 11.5 percent relative to fee-for-service Medicare following the diagnosis's reintroduction into the risk model. (*Id.* at 98).

97. The protein-calorie malnutrition guidance operates the same way at the level of software: the eHouseCalls system has contained logic rules that populate a protein-calorie malnutrition diagnosis in response to "documentation of unintentional weight loss greater than 10% in 6 months OR wt <100lbs OR BMI <19 OR MNA result of <17," and the Company has taught its providers that they "may consider a diagnosis of mild PCM when the criteria for moderate PCM are not met, but the patient's clinical presentation is consistent with malnutrition."

(Grassley Report at 96–97; Optum, *Protein-Calorie Malnutrition (PCM)* (May 24, 2021), UHG-SJC-048141). In contrast, CMS excluded all protein-calorie malnutrition codes from the current risk model. (Grassley Report at 96).

98. At the far end of the discretionary-coding spectrum sits senile purpura—a harmless, self-resolving cosmetic consequence of skin aging, in which fragile blood vessels produce purple blotches after a bump, treated with sunscreen and long sleeves. The Company taught its providers that senile purpura can be coded as "other nonthrombocytopenia purpura" (D69.2), which mapped under the prior risk model to the payment category for coagulation defects and other hematological disorders. (Grassley Report at 102–03; 2023 Clinical Documentation Support Tool, UHG-SJC-026516; OptumHealth, *Documenting and Coding Peripheral Vascular Diseases for Medicare Advantage* (2022), UHG-SJC-047644). CMS excludes the diagnosis from the current risk model as not medically significant, transitory, and adding nothing to the cost of treatment. (Grassley Report at 103). The Report notes that other insurers' provider guidance on capturing senile purpura cites an Optum coding reference book—demonstrating that "the opportunities identified and strategies developed by UHG are not limited to UHG [Medicare Advantage], they permeate the entire [Medicare Advantage] industry." (*Id.* at 103–04). In other words, the Company wrote the playbook for taking advantage of Medicare by aggressively manipulating billing codes.

99. The Company nonetheless assured Chairman Grassley in writing, through Defendant Noel, that *The Wall Street Journal*'s reporting was "deeply flawed," that government audits confirm the accuracy of its submissions, and that artificial intelligence plays no diagnostic role. (Noel Letter at 1, 7). Those written assurances cannot be reconciled with the Company's own internal directives quoted above.

100. The Grassley Report further confirms that the Company monetizes the scheme itself: Optum sells the same diagnostic criteria, coding guidance, chart-review services, and in-home assessment workforce to rival Medicare Advantage organizations, so the Company's strategies permeate the entire industry and compound its regulatory exposure. (Grassley Report at 3–4, 21, 103–04). Optum's external customers include competing health plans, healthcare providers, employers, and governmental entities. Optum therefore did not merely support UnitedHealthcare's internal operations but also commercialized the Company's data, technology, care-delivery, and risk-adjustment capabilities by selling those services throughout the healthcare industry. The Grassley Report closes by observing that risk adjustment has become a freestanding business at the Company—precisely the opposite of what Congress intended. (*Id.* at 104). Because these findings rest on the Company's own training materials, software documentation, policies, and audit tools rather than on adversarial pleading, the Board cannot dismiss them as unproven journalism or litigation posturing.

## E. The Company Knew of the Nonpublic DOJ Investigation by October 2023 and Concealed it From the Market for Four Months

101. On October 10, 2023, the Company received notice that DOJ had launched a nonpublic antitrust investigation into the Company. (*Collins* Compl. ¶ 9). On October 24, 2023, the Company's Chief Legal Officer, Rupert Bondy, circulated an internal email with a document preservation notice to at least 16 high-ranking executives. The investigation was particularly significant to UnitedHealth because Optum provides care-delivery, pharmacy-benefit-management, data-analytics, technology, and other healthcare services both to UnitedHealthcare and to external customers, including UnitedHealthcare's insurance competitors. UnitedHealth's simultaneous operation as an insurer, healthcare provider, pharmacy-benefit manager, and

healthcare-data and technology vendor therefore made antitrust compliance central to the Company's vertically integrated business model.

102. The Company was aware of the nonpublic DOJ investigation since at least October 2023, yet it neither disclosed the investigation to investors nor restricted insider sales while the investigation remained concealed. (*Collins* Compl. ¶ 9). Despite this internal knowledge, the public did not learn of the DOJ investigation until *The Wall Street Journal*—not the Company—disclosed it on February 27, 2024, a disclosure that caused the Company's stock to decline by $27 per share, erasing nearly $25 billion in stockholder value. (*Collins* Compl. ¶ 8).

### F. Insiders Sold More Than $117 Million in Stock While in Possession of Material Nonpublic Information

103. In the four months between the Company's learning of the DOJ investigation and the investigation becoming public, Company insiders sold more than $117 million of their personally held UnitedHealth shares. (*Collins* Compl. ¶ 9). One week after the notice, on October 17, 2023, Hemsley sold shares of Company stock for $65 million. Hemsley sold again on December 5, 2023, for another $36 million; On February 16, 2024, Thompson sold over $15 million worth of Company stock. The Forms 4 relating to these sales indicate that none of them were made pursuant to a Rule 10b5-1 trading plan.

104. For the period between September 21, 2021 through July 8, 2025 inclusive, Hemsley sold 411,908 shares for proceeds of over $211 million; Witty sold 21,556 shares for proceeds of over $11 million; and Burke sold 46,500 shares for proceeds of over $22 million; Thompson sold over 28,943 shares for proceeds of over $15 million. The Forms 4 relating to these sales indicate that none of them were made pursuant to a Rule 10b5-1 trading plan. Delaware law allows the Court to order the disgorgement of profits from trades made on the basis of MNPI acquired through a fiduciary position, without regard to whether the Company itself suffered out-

of-pocket loss from the trades. *See Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949); *Kahn v. Kohlberg Kravis Roberts & Co.*, 23 A.3d 831, 840 (Del. 2011).

### G. The Board Simultaneously Caused the Company to Repurchase More Than $12 Billion of its Own Stock at Artificially Inflated Prices

105. While insiders sold, the Company bought. In January and February 2024, with the DOJ investigation known to the Board but concealed from the market, the Company repurchased 4.2 million shares at average prices of $513.89 and $515.88 per share—approximately $2.2 billion in total—from public stockholders who did not have the information the Board possessed. In the first quarter of 2024 as a whole, the Company repurchased approximately 6.1 million shares at an average price of $505.46, at a cash cost of $3.07 billion. (UnitedHealth Grp. Inc., Quarterly Report (Form 10-Q), at 5, 23 (May 8, 2024)).

106. Rather than curtail the program as red flags multiplied, the Board expanded it. In June 2024, four months after *The Wall Street Journal* exposed the antitrust investigation, the Board amended the repurchase program to authorize the repurchase of up to 35 million additional shares. (UnitedHealth Grp. Inc., Annual Report (Form 10-K) (Feb. 2025)). In the fourth quarter of 2024, following the October 2024 OIG report, the Company repurchased 9.1 million shares at an average price of $537.14 per share—approximately $4.9 billion—including November 2024 purchases at an average of $593.39 per share, near the all-time high. (*Id.*). In the first quarter of 2025, while the Company privately confronted the DOJ criminal investigation which it would not publicly confirm until July 24, 2025, and maintained the guidance it would slash on April 17, 2025, the Company spent another $3 billion repurchasing its shares. (UnitedHealth Grp. Inc., Quarterly Report (Form 10-Q) (May 2025)).

107. In total, from January 2024 through March 2025, the Board caused or permitted the Company to deploy more than $12 billion to repurchase its own stock at average prices ranging

from roughly $484 to $593 per share. Within months, the stock traded below $270, closing at $261.07 per share on July 29, 2025. Had the Company repurchased its stock at these later prices, it would have spent just over $5.5 billion—approximately half of what it actually spent between January 2024 and March 2025. The Company overpaid for every share which the Company repurchased before the fraudulent scheme was exposed, and every dollar of that overpayment is a corporate injury recoverable from the fiduciaries who caused it.

108. The repurchase program ultimately collapsed under the weight of the very misconduct it concealed: the Company halted repurchases in the second half of 2025 as the earnings implosion tightened regulatory capital at its insurance subsidiaries, and it repurchased no shares at all in the fourth quarter of 2025. (UnitedHealth Grp. Inc., Annual Report (Form 10-K) (Feb. 2026).) The Board then resumed the program in 2026: the Company repurchased $4 billion of its stock through mid-July 2026 and announced it is on track to repurchase at least $5 billion for the full year—all while the DOJ criminal and civil investigations remain unresolved and the Board simultaneously professed, in response to Plaintiff's Demand, that it cannot yet evaluate the very misconduct those investigations target. (Press Release, UnitedHealth Grp., UnitedHealth Group Reports Second Quarter 2026 Results (July 16, 2026)). The fiduciary breach is symmetrical with the insider selling alleged above: the wrongdoers sold their personal shares at prices they knew to be inflated while spending billions of corporate dollars to absorb shares at those same inflated prices. Delaware law treats each side of that trade as a violation of the duty of loyalty. *See Brophy*, 70 A.2d at 8; *cf. Marchand*, 212 A.3d at 824.

### H. The Truth Emerged and Devastated the Company

109. The corrective disclosure chronology confirms the magnitude of the harm. On February 27, 2024, *The Wall Street Journal* exposed the scope of the DOJ antitrust investigation,

and the Company's stock price fell more than $27 per share. On February 21, 2025, *The Wall Street Journal* revealed a separate DOJ civil fraud investigation into the Company's Medicare Advantage billing practices; the price of UnitedHealth stock fell $36 per share, and the Company denounced the report as "misinformation." On April 17, 2025, the Company slashed its 2025 profit forecast by 12%—more than $3 billion—citing Medicare Advantage issues, and the Company's stock price fell more than 20% in a single day, from over $585 per share to $454 per share.

110. On May 13, 2025, the Company announced CEO Witty's abrupt departure and suspended its 2025 guidance; the price of UnitedHealth common stock fell nearly 18%, more than $67 per share. The next day, *The Wall Street Journal* reported a DOJ criminal investigation into the Company's Medicare Advantage business, and the Company's stock price fell an additional 11%. That criminal investigation is run by the healthcare-fraud unit of the DOJ's Criminal Division and, per subsequent reporting, had been active since mid-2024. Prosecutors, joined in some interviews by the FBI and HHS-OIG, questioned former employees in detail about the Company's efforts to encourage documentation of lucrative diagnoses, including testing patients and sending nurses to their homes, and interviewed a former HouseCalls nurse practitioner about the software that suggested diagnoses and the manager who urged her to make new ones. The DOJ's criminal inquiry thus targets the same conduct that the Company's own internal documents, since released by the Judiciary Committee, corroborate. Because HouseCalls operates through Optum Health, the investigation implicated not only UnitedHealthcare's receipt of Medicare Advantage payments but also Optum's direct care-delivery and in-home-assessment operations.

111. On July 15, 2025, investors learned the Company had "mask[ed]" declining profits through $3.3 billion of "portfolio refinement" transactions with private equity firms that analysts characterized as "manufacturing earnings." On July 24, 2025, in an about-face, the Company

finally confirmed both the civil and criminal DOJ probes, admitted it was complying with formal criminal and civil requests, and simultaneously announced that it had retained third parties to review its own risk-assessment coding, managed-care, and pharmacy practices—an initiative that concedes existing Board-level oversight of those practices was inadequate. (Press Release, UnitedHealth Grp., UnitedHealth Group Responds to Department of Justice Investigation (July 24, 2025)). On July 29, 2025, the Company disclosed that terminating the portfolio refinement transactions would reduce 2025 guidance by $3.65 billion, and two days later announced the replacement of its CFO, effective September 2, 2025. The stock declined significantly on these disclosures, and the cumulative revelations erased billions of dollars in stockholder value.

112. The disclosures continued into 2026. On January 12, 2026, the Senate Judiciary Committee publicly catalogued the Company's internal risk-adjustment machinery in the Grassley Report, discussed above. And on May 29, 2026, the Massachusetts Attorney General sued UnitedHealthcare in Massachusetts State Court, alleging that from 2015 through 2025 the Company falsely manipulated in-home health assessments of low-income seniors enrolled in MassHealth's Senior Care Options program: classifying members at the highest payment level without qualifying conditions, submitting assessments claiming daily skilled nursing that most members never received or needed, and directing assessment nurses to document members' "worst days" rather than their current condition, thereby defrauding the state Medicaid program of at least $100 million, subject to trebling under the Massachusetts False Claims Act. (Complaint filed May 29, 2026, Mass. AG Action); Press Release, Office of the Mass. Att'y Gen., AG Campbell Sues United Healthcare for Defrauding MassHealth Out of $100 Million (May 29, 2026)).

113. The Massachusetts Attorney General's complaint alleges corporate knowledge and corporate pressure: internal reviews in 2018 and 2019 identified the misclassifications, yet the

Company never disclosed them to MassHealth or repaid a dollar, and the executive who oversaw the Company's Medicaid business publicly berated the Massachusetts plan's chief executive for missing parent-company financial targets, driving her to resign and to testify to state officials about the pressure to grow membership, cut costs, and cut staff. (*Id.*). The Massachusetts Attorney General coordinated with CMS and DOJ throughout her investigation. Because the Company operates comparable dual-eligible and Medicaid managed-care plans in many other states, the Massachusetts action opens a second front of exposure, under state false claims statutes with their own treble-damages provisions, that a faithful board would move immediately to assess.

114. Meanwhile, the DOJ's criminal inquiry widened. In August 2025, *Bloomberg* reported that the criminal investigation extends beyond Medicare Advantage to billing practices at Optum Rx, the Company's pharmacy benefit manager, and to how the Company reimburses its own employed physicians. *See* John Tozzi, *UnitedHealth Ongoing Criminal Probe Is Broader Than Medicare*, Bloomberg (Aug. 26, 2025);[3] *see also UnitedHealth Criminal Probe Goes Beyond Medicare: Report,* Becker's Payer Issues (Aug. 26, 2025).[4] Optum Rx administers prescription-drug benefits, negotiates with drug manufacturers and pharmacies, and operates mail-order, specialty, and infusion-pharmacy services. The investigation's expansion into Optum Rx therefore implicated another major component of UnitedHealth's vertically integrated business model. The expansion of the criminal probe into the Company's vertically integrated provider and pharmacy operations confirms that the compliance exposure the Board has declined to investigate spans the enterprise, not a single program.

---

[3] https://www.bloomberg.com/news/ articles/2025-08-26/unitedhealth-ongoing-criminal-probe-is-broader-than-medicare

[4] https://www.beckerspayer.com/payer/unitedhealth-criminal-probe-goes-beyond-medicare-report/

115. The Company's own review has since documented the oversight deficiencies alleged herein. In December 2025, the Company released the initial results of the third-party review it announced on July 24, 2025, conducted by FTI Consulting and Analysis Group. *See* UnitedHealth Grp., *Our Commitment to Strong Performance and Progress* (Dec. 19, 2025);[5] Letter from Stephen J. Hemsley, Chief Exec. Officer, UnitedHealth Grp., to Stakeholders (Dec. 2025).[6] FTI Consulting, Inc. reviewed the Company's Medicare Advantage risk-adjustment operations and UnitedHealthcare's care services management, and Analysis Group, Inc. reviewed Optum Rx's administration of prescription drug manufacturer discounts. *See* FTI Consulting, Inc., UnitedHealth Group Medicare Advantage Risk Adjustment Report (Dec. 2025);[7] UnitedHealth Grp., Independent Review Program: Care Services Management;[8] UnitedHealth Grp., Independent Review Program: Prescription Drug Manufacturer Discounts.[9]

116. The third-party review commissioned by the Company identified ongoing problems in the three most scrutinized areas of the business—Medicare Advantage risk assessment and coding, UnitedHealthcare's care review and approval processes, and Optum Rx's pass-through of drug manufacturer discounts—and issued 23 remedial recommendations. Most probative here, FTI found that the targeted coding audits directed by Optum compliance were performed by coding personnel who report into coding *operations*—the very function being audited—rather than into compliance, and recommended that the Company establish a dedicated, independent coding audit

---

[5] https://www.unitedhealthgroup.com/newsroom/posts/2025/our-commitment-to-strong-performance-and-progress.html;

[6] https://www.unitedhealthgroup.com/content/dam/UHG/PDF/ns/audit/Letter-from-the-CEO_12-2025.pdf.

[7] https://www.unitedhealthgroup.com/content/dam/UHG/PDF/ns/audit/UnitedHealth-Group-Medicare-Advantage-Risk-Adjustment-Report.pdf;,;.

[8] https://www.unitedhealthgroup.com/investors/standards/reviews/care-services.html.

[9] https://www.unitedhealthgroup.com/investors/standards/reviews/pbm.html.

team within the compliance organization; FTI further found that certain risk-assessment policy materials existed only in draft form or lacked evidence of review within the past year, and that UnitedHealthcare could better document its oversight of risk-adjustment operations. In response, the Company committed to establish an independent coding audit team, to review its risk-assessment policies at least annually, and to enhance its governance structures over policy oversight, compliance monitoring, and risk assessment. Each commitment is an admission: through the Relevant Period, the audit function policing the Company's mission-critical coding machine reported to the coding machine, risk-assessment policies went unreviewed, and Board-level governance of the function was inadequate—precisely the oversight failure alleged in this Complaint.

117. On July 7, 2026 the Company announced that it had implemented all 23 of the reviewers' recommendations and released the initial results of an external audit of diagnosis coding in the HouseCalls program, which the Company characterized as finding most diagnoses supported by medical data.

118. These after-the-fact remedial measures—like the new Public Responsibility Committee the Board created in 2025 to "monitor and oversee financial, regulatory and reputational risks," and the appointment of a new Lead Independent Director—confirm that the governance structures they replaced were deficient throughout the Relevant Period. None of them recovers a dollar of the insider trading proceeds, repurchase overpayments, or excess compensation the Demand seeks, and none addresses the conduct of the individual fiduciaries responsible.

119. Finally, the Company's reflexive denunciation of accurate reporting has itself been adjudicated. In May 2025, The Guardian reported that the Company secretly paid nursing homes

bonuses to reduce hospital transfers for its Medicare Advantage members, with at least one resident allegedly suffering permanent brain damage following a delayed transfer; the Company sued The Guardian for defamation less than two weeks later, denouncing the reporting as "knowingly false." *See* George Joseph, *Revealed: UnitedHealth Secretly Paid Nursing Homes to Reduce Hospital Transfers*, The Guardian (May 21, 2025); Compl., *UnitedHealth Grp. Inc. v. Guardian News & Media LLC*, C.A. No. N25C-06-042 CLS (Del. Super.,. June 4, 2025).

120. Shortly thereafter, Senators Ron Wyden and Elizabeth Warren opened an investigation into the Company's nursing home practices in August 2025, which they renewed "with heightened alarm" on January 7, 2026, after *The Guardian* published a second report on December 17, 2025 detailing three cases in which nursing home residents allegedly died after Optum employees delayed or denied hospital transfers—and after the Company, in the Senators' words, "failed to respond adequately" to their initial inquiry. *See* Letter from Sens. Ron Wyden & Elizabeth Warren to Stephen J. Hemsley, Chief Exec. Officer, UnitedHealth Grp. (Jan. 7, 2026); George Joseph, *UnitedHealth Reduced Hospitalizations for Nursing Home Seniors. Now It Faces Wrongful Death Claims*, The Guardian (Dec. 17, 2025).

121. On July 20, 2026, the Delaware Superior Court dismissed all six of the Company's defamation claims, finding that the Company's complaint "cherry picks language" from the article, that the reporting of the bonuses as "secret," "secretly," or "quietly" paid "is substantially true," and that the Company "cannot claim statements are false based on how they would prefer the Article describe" its program. *See UnitedHealth Grp. Inc. v. Guardian News & Media LLC*, C.A. No. N25C-06-042 CLS, Mem. Op. at 15, 19–21 (Del. Super. Ct. July 20, 2026) (Scott, J.).[10] The pattern is now familiar—and judicially recognized: the Company branded T*he Wall Street*

[10] https://courts.delaware.gov/opinions/download.aspx?id=398450.

*Journal*'s February 2025 report as "misinformation" before confirming the investigations it described; assured Senate Judiciary Committee Chairman Sen. Grassley of full compliance before its own documents contradicted the assurance; and sued *The Guardian* over reporting a court has found substantially true. The nursing home allegations also intersect directly with the Grassley Report's finding that the Company's providers operate in over 1,900 skilled nursing facilities. (Grassley Report at 48).

**INSIDER TRADING**

122. During the Relevant Period, the Insider Trading Defendants engaged in highly unusual and large-scale insider trading, selling personally held UnitedHealth common stock while in possession of MNPI concerning, *inter alia*, the Company's Medicare Advantage upcoding practices, the federal government's repeated findings concerning those practices, and—from October 10, 2023 forward—the nonpublic DOJ antitrust investigation. These significant and highly suspicious trades occurred around key corporate developments that had not yet been disclosed to the public.

123. Hemsley sold 121,515 shares for more than $65 million on October 17, 2023, one week after the Company received notice of the DOJ antitrust investigation, and sold again on December 5, 2023 for another $36 million. Thompson sold $15.1 million of Company stock on February 16, 2024, eleven days before the investigation became public. The Forms 4 relating to these sales indicate that none of them were made pursuant to a Rule 10b5-1 trading plan, and the Securities Class Action alleges no indication that any of these sales were executed under scheduled trading plans. As Professor John Coffee observed, quoted in the Securities Class Action, a general counsel typically declares a trading blackout in light of a sensitive investigation and "[a]pparently, this did not happen" at UnitedHealth.

124. Over the period from September 22, 2021 through July 8, 2026 inclusive, Hemsley sold 411,908 shares of Company stock for proceeds of over $211 million; Witty sold 21,5556 shares for proceeds of over $11 million; Burke sold 46,500 shares for proceeds of over $22 million; and Thompson sold 28, 943 shares for proceeds of over $15 million.

125. The timing, size, and departure from prior trading patterns of these sales, and the fact that the Forms 4 associated with these sales indicate that they were not made pursuant to a Rule 10b5-1 trading plan, demonstrate that the Insider Trading Defendants abused their fiduciary positions to enrich themselves at the expense of the Company and its public stockholders.

**STOCK REPURCHASES**

126. The Individual Defendants substantially damaged the Company and wasted corporate assets by causing the Company to repurchase more than $12 billion of its own stock at artificially inflated prices from January 2024 through March 2025, as follows and reflected in Table 5, below:

(i) in January and February 2024, 4.2 million shares at average prices of $513.89 and $515.88 per share (approximately $2.2 billion), and in the first quarter of 2024 as a whole, approximately 6.1 million shares at an average price of $505.46 (a cash cost of $3.07 billion) (UnitedHealth Grp. Inc., Quarterly Report (Form 10-Q), at 5, 23 (May 8, 2024));

(ii) in the third quarter of 2024, 1.6 million shares at an average price of $579.04 per share (approximately $960 million) (UnitedHealth Group Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2024)).

(iii) in the fourth quarter of 2024, 9.1 million shares at an average price of $537.14 per share (approximately $4.9 billion), including November 2024 purchases at an

average of $593.39 per share, near the all-time high (UnitedHealth Grp. Inc., Annual Report (Form 10-K) (Feb. 27, 2025)); and

(iv) in the first quarter of 2025, another $3.0 billion (UnitedHealth Grp. Inc., Quarterly Report (Form 10-Q) (May 6, 2025)).

**Table 5: Share Repurchases**

| Period | Approx. No. Shares Repurchased | Average Price Paid Per Share | Approx. Cost |
|---|---|---|---|
| First Quarter 2024 | 6.1 million | $505.46 | $3.072 billion |
| Third Quarter 2024 | 1.6 million | $579.04 | $0.96 billion |
| Fourth Quarter 2024 | 9.1 million | $537.14 | $4.9 billion |
| First Quarter 2025 | 6.0 million | $503.72 | $3.0 billion |
| **Total:** | 22.8 million | | $11.93 billion |

127. Each of these repurchases occurred while the Board possessed, and the market lacked, material information concerning the DOJ antitrust investigation (from October 2023), the DOJ criminal investigation (active since mid-2024), the unsustainability of the Company's upcoding-driven Medicare Advantage earnings, and the earnings-masking portfolio refinement transactions. In June 2024, four months after the antitrust investigation became public, the Board expanded the program by authorizing the repurchase of up to 35 million additional shares. The stock closed at $261.07 per share on July 29, 2025—roughly half the average prices at which the Company repurchased. The Company thereby overpaid by billions of dollars for its own shares. And in 2026, with the DOJ criminal and civil investigations still unresolved and the Board professing itself unable to act on Plaintiff's Demand, the Board resumed the repurchase program, buying $4 billion of stock through mid-July 2026 with a stated target of at least $5.0 billion for the full year. (Press Release, UnitedHealth Grp., UnitedHealth Group Reports Second Quarter 2026 Results (July 16, 2026)).

## DAMAGES TO THE COMPANY

128. As a direct and proximate result of the Individual Defendants' misconduct, UnitedHealth has been substantially damaged and faces further damage, including: (*i*) exposure to the DOJ criminal and civil investigations and any resulting fines, penalties, and False Claims Act liability; (*ii*) state false claims act exposure, including the Commonwealth of Massachusetts's pending action seeking at least $100 million, subject to trebling, and the prospect of parallel actions by other states; (*iii*) exposure in the Securities Class Action and related litigation; (*iv*) the loss of billions of dollars in market capitalization; (*v*) the $3.65 billion guidance reduction attributable to unwinding the portfolio refinement transactions; (*vi*) restitution and repayment obligations to CMS; (*vii*) the multi-billion-dollar overpayment for shares repurchased at artificially inflated prices; (*viii*) sustained congressional scrutiny, including the Senate Judiciary Committee's January 2026 majority staff report and any legislative or referral action that follows; and (*ix*) severe reputational harm in the Company's relationships with regulators, providers, and members. Because Optum is a major contributor to UnitedHealth's revenues and profits and provides care-delivery, pharmacy, data, technology, and other services to UnitedHealthcare and external customers, the Company's regulatory and reputational exposure extends across both of its principal businesses. The alleged misconduct therefore threatens UnitedHealth's relationships not only with its insured members and regulators, but also with competing health plans, independent healthcare providers, employers, governmental entities, and other customers that rely on Optum's services.

129. The Company has also expended, and will continue to expend, significant sums for legal fees and costs in defending itself and the Individual Defendants in the government investigations, the Securities Class Action, and related proceedings; for compensation and benefits

paid to the Individual Defendants that were not earned in light of their misconduct; and for the costs of the internal reviews the Company announced on July 24, 2025.

## **DERIVATIVE AND DEMAND-REFUSAL ALLEGATIONS**

130. Plaintiff brings this action derivatively in the right and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, by UnitedHealth as a direct result of the wrongdoing alleged herein. UnitedHealth is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff brings this action in accordance with Federal Rule of Civil Procedure 23.1.

131. Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting its rights.

132. Plaintiff has continuously been a stockholder of UnitedHealth at all times relevant to the wrongdoing complained of and is currently a UnitedHealth stockholder.

133. On July 16, 2026, pursuant to Delaware law, including 8 *Del. C.* § 141(a) and Court of Chancery Rule 23.1, Plaintiff made a formal written Demand on the Board, through counsel for the Company, requesting that the Board (*i*) undertake a good-faith, independent investigation of the misconduct alleged herein, conducted by disinterested and independent directors advised by independent counsel; (*ii*) commence legal proceedings on the Company's behalf against each wrongdoer for breach of fiduciary duty, insider trading, unjust enrichment, waste, and all other available claims, and pursue contribution and indemnification from culpable officers; (*iii*) recover and disgorge all proceeds of the insider sales identified in the Demand and recover damages for the Company's repurchases at artificially inflated prices; (*iv*) claw back incentive-based compensation pursuant to the Company's compensation recovery policy, Section 10D of the

Exchange Act and Rule 10D-1 thereunder, Section 304 of the Sarbanes-Oxley Act, and applicable NYSE listing standards; (*v*) adopt and enforce remedial corporate governance measures, including mandatory trading blackouts upon notice of any material government investigation; and (*vi*) preserve all relevant documents and electronically stored information. *See* Exhibit A.

134. On August 4, 2026, Wilmer Cutler Pickering Hale and Dorr LLP, writing "at the direction of the Board," responded to the Demand by letter. The Response did not commit the Board to investigate, did not commit the Board to any of the actions demanded, and did not refuse the Demand on the merits. Instead, it stated that the Board "concluded the Company's best interests are served by deferring action on your demand pending further developments in" the Securities Class Action and seven other stockholder actions: *Collins v. Witty*, No. 24-cv-3484 (D. Minn.); *McCollum v. Witty*, No. 24-cv-2643 (D. Minn.); *Lovoi v. Witty*, No. 24-cv-3236 (D. Minn.); *Silverman v. Hemsley*, No. 25-cv-02762 (D. Minn.); *Cowan v. Witty*, No. 25-cv-03242 (D. Minn.); *Miller v. Hemsley*, No. 26-cv-00329 (D. Minn.); and *Brinkman v. Witty*, No. 27-cv-24-19567 (Minn. Dist. Ct., Hennepin Cnty.) (together, the "**Derivative Actions**"). *See* Exhibit B.

135. The Response disclosed that the Board's process consisted of the creation of "an informal working group comprised of three independent Board members to analyze similar demands made by other shareholders," which "later reconvened to consider additional similar demands that were received after the working group's initial deliberations." The Response did not identify the working group's members; did not state whether the Board delegated any authority to the working group by resolution or otherwise; did not identify any legal counsel retained by the working group independent of counsel defending the Company and its officers and directors in the Securities Class Action and the Derivative Actions; and did not identify any materials the working group reviewed. Critically, the Response disclosed that the deferral determination was made not

by the working group but by the full Board—"[a]fter receiving advice from the informal working group, and after due consideration and further discussion among the full Board, the Board determined" to defer—meaning that Defendant Hemsley, the principal wrongdoer identified in the Demand, participated in the Board's consideration of, and determination not to act upon, claims against himself.

136. The Response offered three reasons for deferral: (*i*) that acting on the demands now "would divert the Company's resources and disrupt its business;" (*ii*) that the Demand overlaps with the pending litigation, whose further development "will inform the Board's decision-making process or obviate the need for further investigation entirely;" and (*iii*) that initiating an investigation or litigation now "would certainly complicate and potentially conflict with the Company's defense of the allegations in the Securities Class Action and Derivative Actions." The Response asserted that the Board "saw no discernible benefit to making any decision now, and no prejudice as a result of deferring consideration," and committed only that the Board "will revisit your Demand and the other similar demands following [the] conclusion" of the Securities Class Action and Derivative Actions "or, if events make it appropriate, sooner." The Response identified no timeline, no criteria for what developments would trigger reconsideration, and no mechanism by which stockholders would learn the status of the Board's consideration.

137. The Response demonstrated on its face that the Board did not consider the actual contents of Plaintiff's Demand. The Response characterized the Demand as alleging that the Company's officers and directors "misrepresented the Company's firewalls"—an allegation that appears nowhere in the Demand, but rather in ***other*** stockholders' demands and complaints concerning the Change Healthcare acquisition. A The Board's treatment of the Demand as fungible with "other similar demands"—down to attributing to it allegations it does not contain—evidences

a cookie-cutter, boilerplate, form-letter disposition rather than the informed, good-faith consideration which Delaware law requires.

138. Plaintiff, through counsel, responded to the Board's counsel later on August 4, 2026, objecting to the open-ended deferral. *See* Exhibit C. The Objection stated that deferral does not suspend the Board's obligation to preserve the Company's claims, which are subject to limitations and repose periods—including the three-year period of 10 *Del. C.* § 8106—that continue to run while the Board "monitors" other litigation, and demanded written confirmation by August 25, 2026 that the Company had entered into, or would promptly enter into, tolling agreements with each current and former officer and director identified in the Demand, preserving all claims for breach of fiduciary duty, disgorgement, unjust enrichment, contribution, and indemnification. The Objection further requested: (*i*) the identity of the working group's members and the basis for their independence from the officers and directors named in the Demand; (*ii*) whether the Board delegated decision-making authority to the working group by resolution and the scope of any delegation; (*iii*) whether the working group retained legal counsel independent of counsel representing the Company or any individual defendants, and if so, whom; (*iv*) the materials the working group reviewed; the specific developments in the pending litigation that would trigger the Board's reconsideration; (*v*) a commitment to written status updates no less frequently than quarterly; (*vi*) confirmation of a litigation hold covering the subject matter of the Demand, including trading records and Board and committee materials; and (*vii*) confirmation that the Board or its Compensation Committee is evaluating recoupment under the Company's clawback policy and Rule 10D-1. The Objection expressly reserved Plaintiff's right to treat the Board's continued failure to act—particularly any failure to preserve the Company's claims through tolling—as a

functional refusal of the Demand, and reserved Plaintiff's rights under 8 *Del. C.* § 220 to inspect books and records concerning the Board's and the working group's consideration of the Demand.

139. On August 10, 2026, Wilmer Cutler Pickering Hale and Dorr LLP, writing at the direction of the Board, responded to the Objection. *See* Exhibit D. The Supplemental Response identified the members of the working group as Defendants F. William McNabb III, Valerie Montgomery Rice, and Timothy P. Flynn, but declined to disclose the materials provided to the working group on the ground that they were privileged. The Board stated that the working group and the Board had monitored, and would continue to monitor, developments in the related Securities Class Action and Derivative Actions. The Board did not identify a timetable for completing its consideration of the Demand, the specific developments that would trigger reconsideration, whether the working group had retained independent counsel, or whether the Board had delegated decision-making authority to the working group.

140. The Supplemental Response also declined to provide information concerning the Company's document-preservation efforts, stating only that the Company had made "reasonable preservation efforts" and was unaware of any preservation issues. Although the Board asserted that it was unaware of any risk that the claims identified in the Demand would become time-barred because similar claims had already been asserted in pending Derivative Actions, it did not confirm that the Company had entered into tolling agreements with any of the officers or directors identified in the Demand. Instead, the Board contended that relation-back principles would preserve the claims if the Board later elected to pursue them. The Supplemental Response further reserved the Board's right to object to any books-and-records demand submitted by Plaintiff. Moreover, the Supplemental Response did not commit to any trigger for resuming consideration

of the Demand or to providing any periodic reports about the status of its consideration (further supporting the conclusion that there was none).

141. The Board's Response, and its subsequent conduct, constitute a wrongful refusal of the Demand. Indefinite deferral is not investigation, and it is not a decision. While boards have some latitude to determine how to investigate a litigation demand, they are not permitted to defer indefinitely or to stand neutral while the corporation's claims waste. *See Mills v. Esmark, Inc.*, 91 F.R.D. 70, 73 (N.D. Ill. 1981) ("When . . . the shareholder has made a demand upon the corporation, it is incumbent upon the corporation to respond without delay."); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988) (a corporation cannot "stand neutral" regarding a derivative claim asserted on its behalf); *Rich ex rel. Fuqi Int'l, Inc. v. Chong*, 66 A.3d 963, 984–85 (Del. Ch. 2013) (prolonged board inaction on a demand may itself constitute an improper, bad-faith response).

142. The authorities which the Board invoked in the Response—*Witmer v. Sugarman*, No. 17-cv-6923, 2018 WL 4846917 (C.D. Cal. Aug. 23, 2018); *Piven v. Ryan*, No. 05 C 4619, 2006 WL 756043 (N.D. Ill. Mar. 23, 2006); *Maccoumber v. Austin*, No. 03 C 9405, 2004 WL 1745751 (N.D. Ill. Aug. 2, 2004); and *LR Trust v. Rogers*, 270 F. Supp. 3d 1364, 1380–81 (N.D. Ga. 2017)—do not support the Board's position. Each involved a board or committee that deferred for a defined purpose, for a bounded period, while the corporation's interests and claims remained protected. None of these cases sanctions an open-ended deferral, made without identified fiduciaries, without independent counsel, without triggering criteria, and without any step to preserve the corporation's claims from lapsing, pending the "conclusion" of multiple proceedings whose resolution may take years.

143. The Board's refusal was not made in good faith and was not the product of a valid exercise of business judgment, for at least the following reasons:

144. ***First***, the deferral determination was made by the full Board with the participation of Defendant Hemsley—the Board's Chair, the Company's CEO, the principal wrongdoer identified in the Demand, the executive whom DOJ alleged personally supported the 2014 termination of the Claims Verification program after direct warnings from CMS, and the seller of more than $101 million in Company stock during the concealment window. The Response concedes that the Board acted "after due consideration and further discussion among the full Board." A determination not to pursue claims against the Board's own Chairman, reached with the Chairman's participation, is not a disinterested exercise of business judgment.

145. ***Second***, the process the Response describes lacks any hallmark of an informed, good-faith investigation. The Board delegated its analysis to an "informal working group" of three unnamed directors—not a special litigation committee—with no disclosed resolution, mandate, or delegation of authority; no disclosed independent counsel; and no disclosed record of materials reviewed. Only after Plaintiff's express written request did the Board identify the working group's members, and it has still not disclosed the basis for asserting that they are independent, any delegation of authority, any independent counsel, or the materials they reviewed—asserting blanket privilege over the materials provided to the group.

146. ***Third***, the Response's assertion that there is "no prejudice as a result of deferring consideration" is demonstrably false. The Company's claims—including its claims against the Insider Trading Defendants—are subject to limitations and repose periods, including 10 *Del. C.* § 8106, that continue to run during the deferral. Plaintiff expressly demanded that the Board confirm tolling agreements with each identified officer and director by August 25, 2026. The Board

refused, asserting instead that other stockholders' pending derivative complaints—which the Company contends are invalid—preserve the Company's claims. A deferral that permits valuable corporate claims to lapse is not an exercise of business judgment; it is a continuation of the breaches the Demand placed at issue.

147. ***Fourth***, the Response's stated rationale is itself disloyal. The Board reasoned that investigating and pursuing the Company's claims "would certainly complicate and potentially conflict with the Company's defense" of the Securities Class Action and the Derivative Actions. That is an admission that the Board has subordinated the prosecution of the Company's affirmative claims against culpable fiduciaries to the protection of those same fiduciaries as defendants—the precise neutrality-in-favor-of-wrongdoers that Delaware law forbids. *Kaplan*, 540 A.2d at 731. The Company's interest as a potential plaintiff for claims worth billions of dollars is not the same as the Individual Defendants' interest in defeating the claims against them, and a Board that conflates the two has abandoned the corporation it serves.

148. ***Fifth***, the deferral is unbounded. The Response commits the Board to "revisit" the Demand only "following [the] conclusion" of the Securities Class Action and seven Derivative Actions—or "sooner" if unspecified "events make it appropriate"—with no timeline, no triggering criteria, and no reporting mechanism, despite Plaintiff's express request for each. An indefinite deferral terminable at no identifiable point is a refusal in substance. *Rich*, 66 A.3d at 984–85.

149. ***Sixth***, the Response demonstrates that the Board never engaged with the Demand's actual contents, attributing to it allegations which it does not make, evidencing a cookie-cutter, boilerplate, form-letter disposition rather than the informed, good-faith consideration which Delaware law requires.

150. ***Seventh***, a majority of the Demand Defendants face a substantial likelihood of liability on the oversight, insider trading, and repurchase claims described herein. Five of the nine—Hemsley (a director since 2000), Flynn (2017), Montgomery Rice (2017), McNabb (2018), and Noseworthy (2019)—served on the Board continuously through every escalating red flag of the Relevant Period: the September 2021 and October 2024 OIG reports, the October 2023 receipt and four-month concealment of the DOJ antitrust investigation notice, the unrestricted insider sales, and the more than $12 billion in repurchases at inflated prices—and Hemsley since long before the DOJ's February 2017 intervention in the *Qui Tam* Action. Three more—Garcia (appointed 2021), Gil (appointed 2022), and Baker (appointed October 2023, the same month the DOJ notice arrived)—joined the Board and its Audit and Finance Committee in time to preside over the concealment window, the insider sales, and the repurchase program's June 2024 expansion and continuation. Eight of the nine Demand Defendants thus served during, and face potential personal liability for, the core misconduct alleged herein; only Gottlieb joined after it. A board so composed cannot impartially evaluate claims that would run against its own members.

151. Because the Board has wrongfully refused the Demand, its refusal is not entitled to the protection of the business judgment rule, and Plaintiff is entitled to prosecute this action on behalf of UnitedHealth to ensure the Company's valuable claims for relief are properly and timely asserted. *See Spiegel v. Buntrock*, 571 A.2d 767, 775–77 (Del. 1990).

## COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

### (*Against the Individual Defendants*)

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. During the Relevant Period, in connection with the Company's repurchases of UnitedHealth stock, the Individual Defendants disseminated or approved false or misleading statements about the Company specified above—including statements concerning the Company's Medicare Advantage practices and compliance, the denunciation of accurate press reporting as "misinformation," and the concealment of the DOJ investigations—which they knew, or recklessly disregarded, were false or misleading and were intended to deceive, manipulate, or defraud. Those statements and the Individual Defendants' course of conduct artificially inflated the price of the Company's common stock.

154. While the price of the Company's common stock was artificially inflated, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at those inflated prices, spending more than $12 billion between January 2024 and March 2025 alone, as described above.

155. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (*i*) employed devices, schemes, and artifices to defraud; (*ii*) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (*iii*) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon UnitedHealth in connection with the Company's stock repurchases during this period.

156. At the time the statements alleged above were made, the Individual Defendants were in possession of material, adverse, nonpublic information that, *inter alia*: (*i*) the Company's Medicare Advantage earnings depended on the institutionalized upcoding practices catalogued in the Poehling Complaint, the OIG reports, and the internal documents later released with the Grassley Report; (*ii*) the Company was under nonpublic DOJ antitrust investigation from October

2023 and criminal investigation from mid-2024; (*iii*) the Company lacked effective internal controls over Medicare Advantage billing compliance and the public disclosure of government investigations; and (*iv*) as a result, the Company's public statements were materially false and misleading at all relevant times.

157. The Individual Defendants acted with scienter, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to the Individual Defendants or were so obvious that they should have been aware of them.

158. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of UnitedHealth stock at artificially inflated prices during the Relevant Period. Had UnitedHealth known the truth, it would not have repurchased its own stock at those prices. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### (*Against the Individual Defendants*)

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. The Individual Defendants, by virtue of their positions with UnitedHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UnitedHealth and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the

power and influence, and exercised the same, to cause UnitedHealth to engage in the conduct and practices complained of herein.

161. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 20(a) of the Exchange Act. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty

### (*Against the Demand Defendants*)

162. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163. The Demand Defendants owed fiduciary duties to UnitedHealth and its stockholders. Because of their positions as fiduciaries of the Company, the Demand Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. In addition, the Demand Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, which, had they been discharged in accordance with the Demand Defendants' obligations, would have prevented the misconduct and consequent harm to the Company alleged herein.

164. The Demand Defendants violated their fiduciary duties by refusing to act on the claims alleged in Plaintiff's Demand and failing to take the action required by law. The Demand Defendants' refusal of the Demand—accomplished through open-ended deferral made with the participation of an interested Chair, delegation to an unnamed informal working group lacking the attributes of a special litigation committee, neutrality toward the Company's affirmative claims in deference to the wrongdoers' defense, and failure to preserve the Company's claims through

tolling despite Plaintiff's express written request—was not made in good faith and was not the product of a valid exercise of business judgment. The wrongful refusal constitutes a breach of the Demand Defendants' fiduciary duties of loyalty and good faith owed to the Company and its stockholders.

165. As a direct and proximate result of the Demand Defendants' wrongful refusal of the Demand, UnitedHealth has been injured and continues to suffer harm, including the potential loss of valuable legal claims against responsible parties as limitations periods run and the continuation of a governance environment that permitted the alleged misconduct to occur.

166. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT IV

**Breach of Fiduciary Duty**

**(*Against the Individual Defendants*)**

167. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168. The Individual Defendants owed fiduciary duties to UnitedHealth and its stockholders. By reason of their positions as officers and directors of the Company, the Individual Defendants owed duties of good faith, loyalty, candor, and truthful disclosure, together with the specific duties defined by the Company's corporate governance documents, including its Code of Conduct.

169. The Individual Defendants consciously violated these duties by: (*i*) failing to implement, and thereafter failing to monitor, a reasonable Board-level system of reporting and controls over the Company's mission-critical Medicare Advantage billing compliance and antitrust compliance functions; (*ii*) consciously failing to act after the DOJ's 2017 False Claims Act complaint-in-intervention, the September 2021 and October 2024 OIG reports, years of

investigative journalism, and direct Board-level notice of the DOJ investigations placed red flags squarely before them; (*iii*) issuing, causing to be issued, or otherwise permitting the material omissions and misrepresentations described herein, including the denunciation of accurate reporting as "misinformation" and the Company's March 4, 2025 written assurances of compliance to the Senate Judiciary Committee; and (*iv*) causing or permitting the Company to repurchase more than $12 billion of its own stock at artificially inflated prices while material investigations were concealed. The internal documents released with the Grassley Report confirm that the diagnosis-capture apparatus was embedded in enterprise-wide policies, software logic, training curricula, audit rubrics, and incentive compensation sustained for over a decade—the signature of a top-down governance failure rather than isolated employee misconduct—and that the apparatus made the Company a quantifiable outlier among its peers on every metric federal watchdogs measured. (Grassley Report at 21–22, 24–104). The Company's own retained reviewers confirmed the failure in December 2025, finding that the coding audits policing the risk-adjustment function were performed by personnel reporting into coding operations rather than compliance, and that risk-assessment policies existed in draft form or went unreviewed—deficiencies the Company has since committed to remediate. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996); *Marchand*, 212 A.3d at 824.

170. Given the central nature of the Medicare Advantage program to the Company's overall operations, the Individual Defendants knew, or consciously disregarded, that the Company's risk-adjustment submissions and public statements concerning them were materially false or misleading.

171. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UnitedHealth has sustained significant damages. Accordingly, the Individual

Defendants are liable to the Company. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**COUNT V**

**Insider Selling and Misappropriation of Information**

**(*Against the Insider Trading Defendants*)**

172. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173. As directors and officers of UnitedHealth, the Insider Trading Defendants owed UnitedHealth and its stockholders the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions informed by the Company's material nonpublic information.

174. When the sales described herein were made, the Insider Trading Defendants were aware of the Company's Medicare Advantage upcoding practices and the associated regulatory exposure, and—as to the sales made after October 10, 2023—the nonpublic DOJ antitrust investigation. These sales occurred suspiciously close to government investigations and enforcement developments, before the public had any knowledge of them. Despite this knowledge, the Insider Trading Defendants sold their personally held stock on the basis of MNPI, using that information for their own benefit and to the detriment of the Company.

175. The Insider Trading Defendants' sales of UnitedHealth common stock while in possession and control of this MNPI breached their fiduciary duties of loyalty and good faith. Under *Brophy*, 70 A.2d at 8 and *Kahn*, 23 A.3d at 840, the Company is entitled to full disgorgement of the proceeds and profits of those sales, without regard to whether the Company suffered out-of-pocket loss from the trades.

176. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT VI

**Violations of Section 20A of the Exchange Act**

**(*Against the Insider Trading Defendants*)**

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178. The Insider Trading Defendants, by reason of their relationships with the Company as officers and directors, had access, directly or indirectly, to material information about the Company not available to the public. The Insider Trading Defendants knowingly traded on this material, nonpublic information, selling UnitedHealth securities with actual knowledge that the value of those securities was inflated as a result of the false and misleading statements and other fraudulent activities detailed in this Complaint.

179. As part of UnitedHealth's publicly disclosed stock repurchase program, UnitedHealth was a contemporaneous purchaser of UnitedHealth securities, within the meaning of Section 20A of the Exchange Act, when the Insider Trading Defendants sold UnitedHealth securities contemporaneously with those purchases as described above.

180. As a contemporaneous purchaser, UnitedHealth was damaged by the actions of the Insider Trading Defendants in that: (*i*) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 alleged herein; and (*ii*) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT VII

**Waste of Corporate Assets**

**(*Against the Individual Defendants*)**

181. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182. The wrongful conduct alleged herein was continuous, connected, and ongoing throughout the Relevant Period, and resulted in continuous, connected, and ongoing harm to the Company.

183. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (*i*) paying excessive compensation to certain of the Company's directors and officers; (*ii*) incurring substantial legal liability and legal costs, including defending UnitedHealth and certain of its officers in the government investigations, the Securities Class Action, and related litigation; and (*iii*) authorizing the repurchase of UnitedHealth stock at artificially inflated prices, as described above.

184. Plaintiff, as a stockholder and representative of UnitedHealth, seeks restitution from the Individual Defendants, and each of them. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT VIII

**Unjust Enrichment**

**(*Against the Individual Defendants*)**

185. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186. By their wrongful acts and omissions, and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UnitedHealth. The

Individual Defendants either benefited financially from the improper conduct or received bonuses, stock options, or similar compensation from UnitedHealth that was tied to the performance or artificially inflated valuation of UnitedHealth stock, or received compensation that was unjust in light of their misconduct.

187. Defendants Hemsley, Witty, Burke, and Thompson were further unjustly enriched when they sold more than $220 million worth of their personally held UnitedHealth stock while in possession of material nonpublic information. Defendant Hemsley was further unjustly enriched when the Board granted him a $60 million cliff-vesting stock option award, disclosed in the Company's 2026 proxy statement, while he presided over the governance failures alleged herein and while the Board he chairs deferred any evaluation of the Company's claims against him. (UnitedHealth Grp. Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 2026).)

188. Plaintiff, as a stockholder and representative of UnitedHealth, seeks restitution from the Individual Defendants, and each of them, and an order of this Court disgorging all profits, salaries, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches. Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## COUNT IX

### Contribution Pursuant to Section 21D of the Exchange Act for Violations of Section 10(b)

**(*Against Defendants Hemsley, Witty, and Rex*)**

189. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190. Defendants Hemsley, Witty, and Rex are named as defendants in the Securities Class Action, which alleges that they violated Sections 10(b) and 20(a) of the Exchange Act by

making false and/or misleading statements that caused class members to purchase UnitedHealth securities at inflated prices.

191. UnitedHealth is named as a defendant in the Securities Class Action. If UnitedHealth is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

192. Defendants Hemsley, Witty, and Rex are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. These Defendants have damaged the Company and are liable to the Company for contribution. No adequate remedy at law exists for Plaintiff by and on behalf of UnitedHealth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of UnitedHealth, demands judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of UnitedHealth and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Demand Defendants wrongfully refused Plaintiff's Demand;

C. Awarding judgment against the Individual Defendants and in favor of the Company for the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, insider trading, waste of corporate assets, unjust enrichment, and violations of the Exchange Act;

D. Ordering disgorgement to the Company of all proceeds and profits of the Insider Trading Defendants' sales of UnitedHealth stock made while in possession of material nonpublic

information, including Hemsley's more than $155 million, Thompson's more than $15 million, Witty's more than $11 million, and Burke's more than $8.7 million;

E. Ordering recoupment of incentive-based compensation from current and former executive officers to the fullest extent required or permitted by the Company's compensation recovery policy, Section 10D of the Exchange Act and Rule 10D-1 thereunder, Section 304 of the Sarbanes-Oxley Act, and applicable NYSE listing standards;

F. Directing UnitedHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its stockholders from a repeat of the damaging events described herein, including putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Certificate of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote, the following corporate governance policies:

1. a proposal to strengthen the Company's internal controls over Medicare Advantage operations, including risk-adjustment diagnostic criteria, coding guidance, clinician audit programs, and pay-for-coding incentive structures;

2. a proposal to strengthen UnitedHealth's legal compliance function with respect to Medicare Advantage billing policies and procedures and the antitrust laws;

3. a proposal mandating trading blackouts for Section 16 officers and directors upon notice to the Company of any material government investigation;

4. a proposal to strengthen the Board's oversight of the Company's disclosure controls governing the public reporting of government investigations;

5. a proposal to permanently separate the positions of CEO and Chair of the Board; and

6. a proposal to strengthen the Company's controls over insider transactions;

G. Awarding extraordinary equitable and/or injunctive relief as permitted by law, equity, and the statutory provisions sued hereunder, including attaching, impounding, or imposing a constructive trust on the proceeds of the Insider Trading Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of UnitedHealth has an effective remedy;

H. Awarding UnitedHealth restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

I. Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: August 25, 2026

**PERRY & PERRY, PLLP**

/s/ Shawn M. Perry
Shawn M. Perry (MN ID #185000)
950 Wayzata Blvd. E., Suite 103
Wayzata, MN 55391
Telephone: (952) 546-3845
Email: shawn.perry@pppllp.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Telephone: (212) 363-7500
Email: gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

*Counsel for Plaintiff*

# VERIFICATION

I, Vladimir Gusinsky, as trustee of the Vladimir Gusinsky Revocable Trust (the "Trust"), hereby verify that the Trust is a holder of common stock of UnitedHealth Group Incorporated and that it was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint. I have reviewed and authorized the filing of the Complaint on behalf of the Trust. All of the averments in the Complaint regarding the Trust are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

August 26, 2026

vladimir gusinsky (Aug 26, 2026 09:04:18 CDT)

Vladimir Gusinsky, Trustee
Vladimir Gusinsky Revocable Trust